BRIDGEMAN et al. v. FORD, BACON & DAVIS, Inc.

Civil Action No. L. R. 1054.

District Court, E. D. Arkansas, W. D.

Feb. 25, 1946.

Talley, Owen & Talley, Paul E. Talley, and Wayne W. Owen, all of Little Rock, Ark., for plaintiffs.

Sam Rorex, U. S. Atty., and Warren E. Wood, Asst. U. S. Atty., both of Little Rock, Ark., for defendant.

Owens, Ehrman & McHaney and John M. Lofton, Jr., all of Little Rock, Ark., as amici curiae.

LEMLEY, District Judge.

This is an action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., for overtime, liquidated damages, and attorneys' fees, brought by the plaintiff Jesse C. Bridgeman and thirty-eight other men employed as firemen by the defendant, Ford, Bacon & Davis, Inc., in the operation of the Arkansas Ordnance Plant.

The Arkansas Ordnance Plant was one of approximately ninety similar plants, engaged in the loading and assembling of ammunition for the United States Army in the late war, supervised by the Ordnance Division of the War Department of the United States, and under the management of various and sundry corporations, in the present instance, the defendant, Ford, Bac-

on & Davis, Inc., which operated under a cost plus fixed fee contract, all costs expended being reimbursed by the United States Government.

The plant, located at Jacksonville, about fifteen miles from Little Rock, Arkansas, was constructed in 1941-42. The loading of ammunition began on March 16, 1942, and continued until the end of the war. Since that time the plant has been taken over by a Corps of Engineers of the United States Army.

Jacksonville is a village without fire protection, the nearest well-equipped fire department being located at North Little Rock, about fourteen miles away. Therefore, in the course of the building of the ordnance plant it became necessary to install such a department. Two fire stations were built for this purpose, and about seventy men employed. The stations, known as No. 1 and No. 2, were of practically the same construction. They were two-story buildings, with a fire engine room, inspectors' office, wash room and toilet, downstairs, and a dormitory for the firemen, a kitchen, toilet and shower room, and a room for the occupancy and use of an assistant fire chief and a captain, upstairs. The dormitory, which was occupied by the firemen and used as their sleeping quarters at night, was separated by a narrow hall from the room of the assistant chief and captain.

It was necessary, of course, that the plant have fire protection at all times, so the workdays of the men were so shifted that there was an adequate force in the fire stations, day and night, to man the equipment. Prior to November 29, 1943, about seventy men, each working six days a week, in three eight-hour shifts, were employed.

On November 29, 1943, the eight-hour shift arrangement was abandoned, and what is commonly called the two platoon system was inaugurated. Under this system each fireman undertakes a twenty-four hour tour of duty three times a week. Sixteen hours of such tour are supposed to be devoted primarily to the duties of the fire department, and eight hours to sleep and recreation. Compensation is paid for the sixteen hours but no general compensation for the eight hours.

The inauguration of the two platoon system was brought about in the following manner:

During the summer of 1943 the War Department had under consideration the adoption of the two platoon system in order to conserve manpower. In this connection, considerably fewer men are required in the operation of the two platoon system than in the eight-hour shift arrangement. It seems that the War Department was considering the inauguration of the two platoon system in practically all of the ordnance plants under its supervision. At least, the plan was ultimately adopted in approximately 80% of such plants.

Before any definite steps were taken to install the system, the plan was first submitted to the U. S. Department of Labor and approved by it in a letter from Honorable William R. McComb, Deputy Administrator, Wage and Hour Division, to Lt. Col. William J. Brennan, Jr., Chief, Labor Section, Office of the Chief of Ordnance, War Department,[1] and thereafter submitted to the firemen for their approval by means of a secret unsigned ballot, upon which they would express their approval or disapproval. All of the firemen except two voted in favor of the adoption of the system. These two remained in the employ of the company.

The plan as submitted by the War Department to the Department of Labor, and approved by the latter, was substantially complied with during all of the period of time involved in this action.

In operation the two platoon system gave the firemen many more consecutive hours of freedom from duty than they had previously enjoyed; and on their days off, numbers of the men tended their farms and certain others worked at times at other jobs, or went hunting and fishing.

The men served in shifts of twenty-four hours each, followed by a period of twenty-four hours off duty. Each man normally served three such shifts in each week of employment, and was off duty four twenty-four hour periods each week. About every two months each man would have four consecutive periods of twenty-four hours each off duty. The firemen were required to remain in or within call of their respective fire stations at all times. When the system was first installed the twenty-four hour shifts began at 11 P.M. and ended at 11 P.M. the following night, the first eight hours of each shift being considered rest or sleeping time, and the other sixteen hours as working time or time on active duty. This arrangement, in so far as it required the men to check in and check out at 11 P.M., was a rather awkward one, and after approximately two months of such operation, namely, between November 29, 1943, and January 31, 1944, the checking in and checking out times were changed from 11 P.M. to 7 A.M., and so continued throughout the entire period of time under consideration. Under the latter arrangement the sixteen hour period between 7 A.M. and 11 P.M. was regarded as work time, and the eight hours from 11 P.M. to 7 A.M. as sleep or rest time, but in practice the men were permitted to go to bed at 9:30 P.M. instead of 11 P.M.

---

[1] The letter of the Deputy Administrator is as follows:

"October 11, 1943
In Reply Refer to:
AD:JBM:zls

* * *

"Re: Two-Platoon System for Firemen at Arkansas Ordnance Plant

"Dear Colonel Brennan:

"This will reply to your letter dated October 7, 1943, with which you forwarded further correspondence from the commanding officer of the subject project which changes somewhat the plan as proposed earlier and as described in my letters to you dated July 19 and August 16, 1943.

"As I understand it now, each fireman will be on a 24-hour tour of duty on three days each week and during each such tour of duty the last eight hours will be free time in which they will be permitted to sleep or do whatever else they desire, except that it will be necessary that they remain at the fire station in order to be available should an alarm be turned in. No payment will be made for these last hours unless the men are called to duty to answer an alarm, in which event they will be paid at straight time for such time, or at time and one-half provided that they have already accumulated the regular 40 hours at the straight time rate. In any event it is proposed to pay the men a time and one-half allowance for all hours actually worked in excess of 40 in any one week.

"I further understand that the arrangement is mutually satisfactory to the employees and the employer. It appears, therefore, to be unobjectionable and the payment to employees in accordance with the plan would not appear to be violative of the Fair Labor Standards Act.

"Very truly yours,
"/s/ Wm. R. McComb
"Wm. R. McComb
"Deputy Administrator"

The men were paid at the rate of $35 for the first forty hours worked in each week, and time and one-half for the remaining hours worked, but received no compensation for the eight hours of rest or sleeping time, unless summoned to answer a fire call or make an ambulance run, in which event they were paid, for fire calls, time and one-half with a minimum of thirty minutes for any time spent less than that period, and a minimum of one hour for any period of time worked between thirty minutes and one hour, and for ambulance runs, time and one-half. In practice the men earned about $45.50 per week, exclusive of the special compensation allowed them for fire and ambulance runs during the eight-hour rest period.

The general duties of the firemen during the sixteen-hour work period consisted of cleaning of the fire stations and of the sleeping and living quarters, checking equipment, and washing and polishing of the fire trucks and accessories, with occasional drills and practice runs, and of course the answering of fire alarms. Ordinarily, two hours out of the sixteen-hour work period would be all that was required for the routine duties. There were comparatively few fire alarms, and most of the sixteen-hour period was occupied by the men in reading, playing games, listening to the radio, and eating. The facilities provided by the company for the use of the firemen included shower bath and toilets, steam heat, electric fan, cards, checkers and chess for games, a well-equipped kitchen, with range, sink and utensils; an electric refrigerator; beds, blankets and bed linen, with laundry service therefor.

The company pursued a liberal policy with respect to tardiness and brief absences in the course of the shift. Many of the men lived at considerable distances from the plant and it was the practice of the fire chief not to have the men docked for brief absences during the work period if they had a good excuse, and during the rest period it was the policy of the company not to dock the men at all, and they were not so docked except in a few instances, which have been explained to the Court's satisfaction as being errors of time-keepers.

From the time the two platoon system was inaugurated up until May 14, 1944, the men were called out during the rest period for fire runs only, and were specially compensated therefor as above set forth. On said date two ambulances, which had theretofore been stationed at the plant hospital, were moved, one to each fire station, and one or two firemen were called from time to time to drive the ambulances and answer ambulance calls. This work was divided around among the men, and usually assigned to those who preferred to drive rather than to remain at the station. Ambulance calls made during the rest period were specially compensated for as above indicated. Fire and ambulance runs made during the rest period were termed by the witnesses in this case "emergency runs," and from now on will be referred to under that term.

The allegations of the plaintiffs'[2] complaint were general and not specific. It was charged that between the dates of November 29, 1943, and May 27, 1945, the defendant had failed to pay the complainants certain overtime compensation, and as a result was due them an aggregate amount of approximately $130,000 for overtime and liquidated damages. Two specific issues were developed at pre-trial conferences and in the excellent pre-trial briefs which were filed at the request of the Court: (1) Whether under the Fair Labor Standards Act the firemen were entitled to compensation for the eight-hour rest and sleeping period, and (2) whether, as was contended at the conferences and in plaintiffs' brief, the men had reported for work a substantial period in advance of the regular clocking in time, had been immediately put to work and had not been compensated therefor. No proof was offered on the second contention and it has been abandoned.

The case was submitted to the Court on an agreed statement of facts and oral testimony, in the course of which proof was offered by the plaintiffs to the effect that during the first two months of service under the two platoon system, that is, during the period when the firemen checked in at 11 P.M. when their rest period was supposed to begin, the men who drove the fire trucks inspected their trucks, and all of the men, including the truck drivers, made up their beds and did certain other chores, all of which it was contended amounted to work for which no compensation had been paid. Counsel for the defendant objected to the introduction of this

---

[2] The word "plaintiffs" as used in this opinion includes intervenors.

evidence on the ground that it conflicted with certain provisions of the agreed statement of facts, but finally agreed that, while he was unwilling to waive any of the provisions of the stipulation, he would concede that if the proof showed that the men were permitted to do actual work for any definite length of time during the rest period, they would be entitled to recover therefor.

We will first take up the question as to whether the men were permitted to work any part of their rest period during the two months in question, and if so, for how long. On this point, while there is a conflict in the evidence as to just what chores or services were performed immediately upon checking in, a preponderance of the evidence discloses that between the time the men checked in and the time that they retired, the drivers of the fire trucks, as routine, went to the clothing rack in the engine room, got their helmets and fire coats and placed them on their trucks; that thereafter they gave their trucks a careful inspection, including warming up the motors, testing their booster pumps, and checking of the oil, gas and water and all material and appliances on the trucks; that after this inspection they went upstairs to the dormitory secured their combination fire suits and boots, placed them beside their beds, procured their bed clothes from their lockers and made up their beds. The proof with respect to what was done by the men other than the drivers, between the time that they checked in and the time that they retired, is that they did all of the things that were done by the drivers, except the inspecting of the fire trucks. In this connection, there was some testimony to the effect that the men other than the drivers assisted in inspecting the trucks and cleaned out the dormitory before going to bed, but we do not so find. We believe that at the time the men other than the drivers placed their helmets and fire coats on the trucks to which they were assigned, they glanced at their stations on the trucks —the plugmen to see that their plug wrenches · were at hand, and the hosemen that their nozzles were in place—but did not make an actual inspection of the trucks. As to the cleaning out of the dormitory, we find that it was done before 11 P.M. by the men of the preceding shift.

■ We find that it took the truck drivers who served during the two months period in question, twenty (20) minutes each night to inspect their fire trucks, and in our opinion this constitutes employment time within the meaning of the Fair Labor Standards Act. Each driver was responsible for his truck, and it was necessary for the protection of the ordnance plant that each truck be ready for action at any moment. The inspection in question was a substantial one, involving the checking not only of the gasoline, oil and water in the fire trucks, but also of the pumps, ladders, tools, and all fire fighting equipment carried thereon; and this service was performed in furtherance of the company's business, with no benefit to the employees other than to aid them in the performance of their work. The service, moreover, was not an inconsequential or elusive one, and in our judgment is compensable.

■ With respect to the time spent by the employees, both truck drivers and others, in getting their helmets and fire coats from the clothing rack in the engine room and placing them on the trucks to which they were assigned, securing their combination fire suits and boots and their bed clothes from their lockers in the dormitory, and making up their beds, the situation is different, and one which we think comes within the rule announced by the Circuit Court of Appeals of the Fifth Circuit in Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123 et al., 135 F.2d 320, 323, in which that Court said:

"With respect to time spent by employees checking in and out and procuring and returning tools, lamps, and carbide, * * *. In addition to the practical difficulties incident to the computation of isolated moments so elusive in character, we think these pursuits should not be computed as work-time, since they fall within the category of duties incident to qualifying the employee to perform his work rather than within the scope of his actual employment."

On the main issue in this case, namely, whether the plaintiffs are entitled to recover for the entire eight-hour rest period provided for under the two platoon system, their contention, as we understand it, is twofold: First, that since it is admitted that the men were required to remain at their fire stations and away from their homes during the entire rest period, as a protection to the plant, they were at all times "employed" within the meaning of the statute, and are entitled to recover as a matter of law; and secondly, if such is not the law, that they are still entitled to

recover on the facts, which they insist disclose that the rest period was interrupted to such an extent as to deprive them of the enjoyment thereof and of a normal night's sleep.

We cannot agree with the plaintiffs in either of these contentions.

In Johnson et al. v. Dierks Lumber & Coal Co., 8 Cir., 130 F.2d 115, 120, the Circuit Court of Appeals of this Circuit had under consideration an appeal involving among other questions the one as to whether sleeping time should be excluded from employment hours. The plaintiffs, two in number, had been employed by the defendant company to grease and service trucks and tractors and to keep watch, seven days a week, over motor equipment, mules and other property at certain stations in the woods, termed "grease camps." Under their agreement they lived in trailers provided by the company and spent their entire time at the camps. The manual labor performed by them, consisting mainly of servicing trucks and caring for mules, consumed about six hours per day, for which, under their agreement, they were paid. The rest of each twenty-four hour period was spent in caring for the company's property at the camp and in sleeping. For this, under the agreement, they were not paid. They brought suit under the Fair Labor Standards Act to recover compensation for the eighteen hours of each twenty-four hours spent as caretaker and in sleep. The District Judge directed a verdict for the defendant. The Circuit Court of Appeals reversed and remanded the case, holding that upon the record it could not be said as a matter of law that the plaintiffs should be allowed compensation only for the time devoted to manual labor. A concurring opinion was written by Judge Kimbrough Stone, in the course of which he stated that since there was to be a new trial it seemed advisable to make an additional statement, which might be helpful to the trial judge on retrial. Whereupon, he said:

"My view is that the time when these plaintiffs could be sleeping is not to be treated as hours of employment *in the factual situation shown in this present record*. I do not mean that, in every case nor under all circumstances, sleeping hours should be excluded from employment hours. Whether they should or not must depend upon the factual situation of each case as it appears. That such hours may be excluded under certain fact situations is not a novel idea

(see Muldowney v. Seaberg Elevator Co.. D.C., 39 F.Supp. 275, 282, and Interpretative Bulletin No. 13, Department of Labor, Wage and Hour Division, paragraph 1, 2, 6 and 7). Nor do I mean to exclude the time when plaintiffs might be aroused at night to care for the property. I cover solely the time when they were or could have been sleeping at night."

In Muldowney v. Seaberg, supra [39 F. Supp. 282], cited by Judge Stone, the District Court of the Eastern District of New York had the following to say with respect to whether sleeping hours should be excluded from or included in employment hours:

"In computing the hours of overtime I will be guided by Interpretative Bulletin No. 13, Paragraphs 6 and 7, United States Department of Labor, Wage and Hour Division, Office of Administrator, November 1940, from which it is clearly apparent that where the employee stays at the employer's place of business at night, as in the case at bar, and in the ordinary course of events has a normal night's sleep, and ample time for meals, and time for relaxation, and entirely private pursuits, such time must be excluded as this seems to me to be clearly the intent of the law."

In both of the cases just cited, reference is made to Interpretative Bulletin No. 13 of the Department of Labor, Wage and Hour Division. This Bulletin will be referred to later.

In Harris v. Crossett Lumber Co., D.C., W.D. of Ark., 62 F.Supp. 856, 858, an action to recover overtime compensation under the Fair Labor Standards Act, the plaintiff was employed as a pumper or tender of five water wells, each equipped with an electric motor, and was required to keep them in operation for a period of twenty-four hours per day, seven days a week, and to give whatever time was necessary therefor. No definite hours of employment were considered in fixing his monthly salary. His residence was equipped with a telephone, and he was required to be on the property at all times or to have someone else present who could be notified if the company desired any of the wells to be cut off, or put on if they had previously been cut off for any reason. This was necessary in order to maintain a uniform and adequate supply of water at all times. He was subject to call any time day or night, and often received calls during the nighttime. He brought suit for compensation for the eighteen-hour period above men-

tioned. In the findings of fact filed by Judge John E. Miller in the case is the following:

"A reasonable computation of the working hours of the plaintiff per week during the time from May 20, 1940, to October 3, 1942, is 84 hours. It appears reasonable to the court that 12 hours of every 24 was available to the plaintiff for uninterrupted sleep, the conduct of his own personal affairs and the ordinary normal routine of living and, therefore, the court finds that the plaintiff did not work 24 hours per day as contended by him, but that he did work 12 hours per day, or 84 hours per week."

Counsel for plaintiffs have stressed, both in their pre-trial briefs and oral argument, certain language of the Circuit Court of Appeals in Wantock et al. v. Armour & Co., 7 Cir., 140 F.2d 356, 357, wherein the Court criticized the District Court for drawing a distinction between a fireman living on the employer's premises who was subject to call but who was sleeping, and one who was subject to call and listening to the radio or playing solitaire (but at the same time stated that the correctness of the District Court's holding in this connection was not before it since the employees had not appealed from that part of the judgment). The language referred to is as follows:

"Inconsistency is at once suggested when a distinction is made between an employee living in the packing house, who is subject to call, but who is sleeping, and one who is subject to call and is listening to the radio or playing solitaire."

This language is of course dictum, as counsel admits. In the Wantock case the District Court had under consideration a case involving firemen. The facts were similar to those in the instant suit except that the firemen were paid no special compensation when aroused from their sleep to answer emergency calls. The overtime involved was that spent on the premises subject to call but otherwise devoted to recreation or sleeping. The men began work in shifts at 8 A.M. The following nine hours, with one-half hour off for lunch, were spent in inspecting and keeping in order the fire fighting apparatus, including engines, etc., and a sprinkler system, and in answering alarms. At 5 P.M. they checked out and thereafter remained on call in the fire hall of the company until the following morning at 8 A.M. They were paid only for the time spent in active duty between 8 A.M. and 5 P.M., and were not paid com-

pensation for the remaining fifteen hours in each twenty-four. For this they brought suit. The District Judge, based on the evidence in the case, held that the employees devoted one and one-half hours to eating and seven hours to sleeping each twenty-four hours, and that the remainder of the twenty-four hours was working time for which the men should be compensated. The criticism of the Circuit Court of Appeals was directed to the action of the District Judge in refusing to hold that the men were entitled to compensation for the eight and one-half hours eating and sleeping time. The case was appealed by the defendant to the Supreme Court. Armour & Co. v. Wantock et al., 323 U.S. 126, 65 S.Ct. 165, 168, and was affirmed, the Supreme Court holding that, both courts below having concurred in finding that the time spent on the employer's premises subject to call—excluding time spent in sleeping and eating, but including time spent in idling or in recreation—was working time and compensable as such, such holdings would be affirmed. No reference was made by the Supreme Court to the dictum contained in the opinion of the Circuit Court of Appeals. The Court said in this connection that "whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case."

On the day the Supreme Court decided the Wantock case, it also handed down its decision in Skidmore et al. v. Swift & Co., 323 U.S. 134, 139, 65 S.Ct. 161. The facts in the Skidmore case were somewhat similar to those in the Wantock case, and certiorari was granted in both cases in order to resolve a conflict in the holdings of the Circuit Court of Appeals of the Fifth and Seventh Circuits. Both opinions were written by Justice Jackson. There were no dissents, and they should be read together and so considered. In the Skidmore case certain of the plaintiffs were engaged in general fire hall duties and maintenance of fire fighting equipment at one of the defendant's plants. The remainder operated elevators and acted as relief firemen. Under their oral agreement of employment, all of the men undertook to perform their regular duties as firemen or elevator operators during part of a twenty-four hour period, and in addition thereto undertook to stay in a fire hall on the company's premises, or within calling distance, three and one-half to four nights a week. The latter undertaking involved no particular task other than to answer

fire alarms or those caused by the sprinkler system being turned on. No fires occurred during this time and alarms were rare. The men were paid a weekly salary with special compensation for each alarm answered by them during the time spent in the fire hall. Sleeping quarters, a pool table, a domino table, and a radio were furnished the men for use while at the hall, and their time was spent in sleep or amusement, as they saw fit, but they were required to remain in the hall or in hailing distance at all times.

We have secured a copy of the transcript of the record filed with the Circuit Court of Appeals of the Fifth Circuit in the Skidmore case. This discloses that, under the agreed statement of facts upon which the case was submitted, tours of duty were staggered, but that a typical schedule of hours for three twenty-four hour periods in a week was as follows:

the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." [323 U.S. 134, 65 S.Ct. 163.] The Court stated further:

"Congress did not utilize the services of an administrative agency to find facts and to determine in the first instance whether particular cases fall within or without the Act. Instead, it put this responsibility on the courts. Kirschbaum Co. v. Walling, 316 U.S. 517, 523, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638. But it did create the office of Administrator, impose upon him a variety of duties, endow him with powers to inform himself of conditions in industries and employments subject to the Act, and put on him the duties of bringing injunction actions to restrain violations. Pursuit of his duties has accumulated a considerable experience in the problems of ascertaining working time in employments in-

|  |  | Hours |
|---|---|---|
| 6:00 A.M. to 7:00 A.M. ......... | Breakfast (time off) ........ | 1 |
| 7:00 A.M. to 3:30 P.M. ......... | Operate elevator or general relief .................... | 8 |
| Mid-day lunch period .......... | Time off .................... | 1/2 |
| 3:30 P.M. to 5:30 P.M. ......... | Supper (time off) .......... | 2 |
| 5:30 P.M. to 6:00 A.M. ......... | Fire Hall .................. | 12½ |

Suit was brought to recover for the twelve and one-half hours spent in the fire hall.

The District Court, 53 F.Supp. 1020, and the Circuit Court of Appeals, 136 F.2d 112, held that there could be no recovery for any part of the twelve and one-half hours in question. The Supreme Court reversed and remanded the case to the District Court, we take it because of the incorrect theory adopted by the latter court as reflected by its general observation that "of course we know pursuing such pleasurable occupations or performing such personal chores" (talking, reading, bathing, dressing, shaving, sleeping, playing pool, dominoes, checkers and other games, listening to the radio) "does not constitute work." In the course of its opinion the Supreme Court stated that each case of this nature must stand on its own facts; that whether in a concrete case waiting time is working time, or vice versa, is a question of fact to be resolved by appropriate findings of the trial court; that such findings involve "scrutiny and construction of the agreement between the particular parties, appraisal of their practical construction of

volving periods of inactivity and a knowledge of the customs prevailing in reference to their solution. From these he is obliged to reach conclusions as to conduct without the law, so that he should seek injunctions to stop it, and that within the law, so that he has no call to interfere. He has set forth his views of the application of the Act under different circumstances in an interpretative bulletin and in informal rulings. They provide a practical guide to employers and employees as to how the office representing the public interest in its enforcement will seek to apply it. Wage and Hour Division, Interpretative Bulletin No. 13.

"The Administrator thinks the problems presented by inactive duty require a flexible solution, rather than the all-in or all-out rules respectively urged by the parties in this case, and his Bulletin endeavors to suggest standards and examples to guide in particular situations. In some occupations, it says, periods of inactivity are not properly counted as working time even though the employee is subject to call. Examples are an operator of a small telephone exchange where the switchboard is in her

home and she ordinarily gets several hours of uninterrupted sleep each night; or a pumper of a stripper well or watchman of a lumber camp during the off season, who may be on duty twenty-four hours a day but ordinarily 'has a normal night's sleep, has ample time in which to eat his meals, and has a certain amount of time for relaxation and entirely private pursuits.' Exclusion of all such hours the Administrator thinks may be justified. In general, the answer depends 'upon the degree to which the employee is free to engage in personal activities during periods of idleness when he is subject to call and the number of consecutive hours that the employee is subject to call without being required to perform active work.' 'Hours worked are not limited to the time spent in active labor but include time given by the employee to the employer. * * *'

"The facts of this case do not fall within any of the specific examples given, but the conclusion of the Administrator, as expressed in the brief amicus curiae, is that the general tests which he has suggested point to the exclusion of sleeping and eating time of these employees from the work-week and the inclusion of all other on-call time: although the employees were required to remain on the premises during the entire time, the evidence shows that they were very rarely interrupted in their normal sleeping and eating time, and these are pursuits of a purely private nature which would presumably occupy the employees' time whether they were on duty or not and which apparently could be pursued adequately and comfortably in the required circumstances; the rest of the time is different because there is nothing in the record to suggest that, even though pleasurably spent, it was spent in the ways the men would have choosen had they been free to do so."

The Clerk of the United States District Court for the Western District of Texas, Fort Worth Division, has very kindly furnished us with copies of the District Judge's findings of fact and conclusions of law and judgment upon remand in the Skidmore case, which disclose that the court found as a fact, that "during the times plaintiffs were required to stay in or close to the fire hall, they had at least 8½ hours each night for uninterrupted sleeping, dressing, and other private pursuits; they also had ample time for relaxation and entirely private pursuits, aside from the time spent in their regular duties and spent in or close by the fire hall"; and concluded as a matter of law, that "the times plaintiffs spent in the fire hall, subject to call to answer alarms, less 8½ hours each night for sleeping, dressing, and other private pursuits, constitute hours worked for which overtime compensation is due them under the Fair Labor Standards Act."

We conclude from the foregoing authorities that the rulings and interpretations of the Administrator of the Wage and Hour Division, United States Department of Labor, hereinabove referred to, namely, Wage and Hour Division Interpretative Bulletin No. 13, and the informal ruling made in the letter of the Deputy Administrator, Wage and Hour Division, above mentioned (wnerein he stated that the two platoon system as operated in the instant case appeared to be unobjectionable and that payment to the employees in accordance with the plan would not appear to be violative of the Fair Labor Standards Act), while not controlling upon us, constitute a body of experience and informed judgment to which we may properly resort for guidance in this action.

These interpretations are fair, just and reasonable, and should be applied here.

We further conclude that time spent by an employee in a rest or sleeping period—the employee being subject to call for emergencies, and being compensated specially therefor—may, but need not necessarily, be considered as employment hours under the provisions of the Fair Labor Standards Act. Whether or not such sleeping time constitutes employment hours depends upon the facts in each particular case. In this connection, it is important to determine the degree with which the employee is free to obtain normal rest and the degree of interference with his normal mode of living and freedom of action. And where the only substantial interference with such normal mode of living and freedom of action is that the employee is required to sleep away from home, the time devoted to rest and sleep should not be considered as employment hours. But if the rest period be interrupted to such an extent as to deprive the employee of a normal period of consecutive hours for sleep, then such period should be considered as hours of employment under the provisions of said Act.

In the case at bar, plaintiffs, during the first two months of operation under the two platoon system, were given from 11 P.M. to 7 A.M. within which to sleep and engage in activities of their own choosing. After the first two months they were allowed, under their agreement with the company, a similar eight-hour period of rest extending from 11 P.M. to 7 A.M., but, in practice, were permitted to retire at 9:30 P.M. Their contention is that the rest periods referred to were so interfered with by outside noises and emergency calls that they were unable to enjoy the same or obtain a normal night's sleep. The plaintiffs have failed to sustain the burden of proof in this regard.

In the course of the first two months, the plaintiffs were required, during the rest period, to answer fire calls only, and the proof shows that only sixteen fire runs were made during the rest period between November 29, 1943, and May 27, 1945, a period of eighteen months, and of average duration of slightly less than one hour. After the first two months, as stated, the men checked in at 7 A.M. instead of 11 P.M. Some three and one-half months after the change was made, the ambulances were moved from the hospital to the fire stations, and emergency calls were more frequent. A compilation from defendant's records, filed as an exhibit herein, and which we accept, discloses however, that, taking into consideration both fire and ambulance runs made during the eight-hour rest period, over the entire period from November 29, 1943, to May 27, 1945, thirty-eight plaintiffs averaged forty-one minutes per one hundred hours rest or sleeping time on both fire and ambulance calls, or, conversely, ninety-nine hours and nineteen minutes of each one hundred hours rest or sleeping time were uninterrupted by reason of emergency calls of any nature.[3]

Some of the firemen testified that they were disturbed by the fire inspectors who had an office on the first floor of the fire station, but the fire chief, Mr. Lawrence A. Pluche, testified that he had received only one complaint in this regard during the entire period under consideration, which was on account of the inspectors storing their clothes in lockers on the second floor; and that he immediately moved the lockers downstairs; also, that the inspectors spent practically all of their night-time in inspecting various parts of the ordnance area, which comprised about 7400 acres. Some of the men complained that the beds were not comfortable. These were small iron beds, fitted with mattresses and springs, such as are frequently used in dormitories occupied by numbers of men. Chief Pluche stated that he and his wife sleep on identical beds every night. Others complained of snoring. Doubtless it took time for the men to adjust themselves to sleeping in a dormitory along with a number of others, but, on the whole, the Court finds that their rest period was not materially interrupted, and that they obtained a normal night's rest.

In our opinion the only substantial interference with the men's normal mode of living and freedom of action during the rest period was that they were required to sleep away from their homes.

A case entitled Claude Bowers et al. v. Remington Rand, Inc., 64 F.Supp. 620, involving an issue practically identical with the main issue in this case, and arising out of the operation of a two platoon system at the Sangamon Ordnance Plant at Illiopolis, Illinois, was recently tried in the U. S. District Court for the Southern District of Illinois, Southern division. The findings of fact and conclusions of law filed by the District Judge are reported in 10 Labor Cases, No. 62,914. The holding of the Court was in line with our decision here.

Findings of fact and conclusions of law in conformity with the foregoing opinion are filed herewith.

[3] The exhibit also shows that thirty-eight plaintiffs spent a total of 6,153 nights in the dormitory, or an average of 162 nights each, and that based on the average time of emergency runs during the rest or sleep period, each plaintiff on an average suffered 15 seconds interruption during each eight hours of sleeping time. For no apparent reason this compilation was made as to thirty-eight instead of thirty-nine of the plaintiffs. The case of the omitted plaintiff, however, is not atypical.