**RURAL FIRE PROTECTION COMPANY, a corporation, Appellant,**

v.

**William E. HEPP et al., Appellees.**

No. 20461.

United States Court of Appeals
Ninth Circuit.
Sept. 16, 1966.

John B. Marron, Phoenix, Ariz., for appellant.

Champe Raftery, Phoenix, Ariz., for appellees.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

BARNES, Circuit Judge.

This is an appeal from a final decision of the United States District Court for the District of Arizona. The district court had jurisdiction pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1337. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

Defendant-appellant is an Arizona corporation engaged in furnishing private fire department type fire protection to municipal, industrial, commercial and residential customers who subscribe to and pay for the protection offered by appellant. Appellant had 9,443 accounts at the time of trial, some of whom were either directly engaged in interstate commerce or in producing goods for interstate commerce.

All of the plaintiffs-appellees involved in this case were university students employed by appellant to serve as firemen. All worked under an employment arrangement in which they were hired as "sleepers," i. e., they resided permanently at the Scottsdale fire station operated by appellant and were required to be present for duty every alternate weekday from 4:30 P.M. to 8:00 A.M. and every Sunday for a twenty-four hour shift. During alternate-day 4:30 to 8:00 shifts of duty, the men were permitted eight hours of sleep, unless a fire interfered. The monetary compensation for this employment specifically provided in the employment agreement was $3 for each 4:30 to 8:00 shift, unless a fire occurred during the shift. If a fire occurred, the men received no extra compensation for the first hour of fire fighting but were paid an additional $1 per hour for each additional hour of time spent actually fighting fires. For the twenty-four hour Sunday shift the men were paid $15.44. All of the "sleepers" lived permanently at the Scottsdale

station even when not on duty, and were provided with a stove, refrigerator, beds, a small amount of furniture and storage space. On alternate weekdays when the men were not on duty it was understood that they could be placed on duty if a fire occurred, and would be paid overtime for such extra duty. When on duty and not engaged in either fighting fires or sleeping the allotted amount, the men performed such other functions as cleaning the premises, painting, pouring cement, landscaping, and making first aid calls. There appears to be no disagreement regarding the practice of the appellees to swap on-duty time and to substitute for one another when it was more convenient for the men to do so.

On June 16, 1961, appellees filed their complaint alleging that they were entitled to the coverage of the Fair Labor Standards Act (hereinafter "the Act") and that the wages they had received were below the minimums provided by that Act. During the period in suit the minimum wage guaranteed by the Act for those entitled to its coverage was $1 per hour for regular time and $1.50 per hour for overtime over 40 hours per week.

During the course of the trial the district court dismissed the cause of plaintiff Harold E. Camp on the ground that Camp, Chief of the Scottsdale station, was an executive of the defendant and not entitled to the coverage of the Act. No appeal is taken from that dismissal. On June 25, 1964, the district court judge handed down a memorandum decision (C.T. pp. 12–16) in which he stated that he did not feel that the services of the plaintiffs were the kind of employment which should be regulated by the Act, but nevertheless found that the plaintiffs fit within the literal terms of the Act. The district court held that the plaintiffs were entitled to recover the amounts that they had been underpaid and were entitled to attorney's fees as provided in the Act, but were not entitled to liquidated damages as provided by the Act on the ground that the defendant had acted in good faith throughout. Formal findings of fact, conclusions of law and judgment

were filed June 25, 1965, and this appeal by the employer followed.

I. Do the Appellees Fit Within the Coverage of the Fair Labor Standards Act?

The answer to this question poses two problems: first, a legal problem as to whether or not the type of work done by appellees fits within the coverage of the Act, and second an evidentiary problem as to whether or not appellees have shown a sufficient participation in interstate commerce to meet the requirements of the Act.

At this late date it is clear beyond serious dispute that the Fair Labor Standards Act of 1938 covers the employment of such workers as firemen who have only the most incidental connection with interstate commerce, providing there exists adequate proof of their connection with interstate commerce.

29 U.S.C. §§ 206, 207, the minimum wage and maximum hour provisions of the Act under which this suit was brought, apply to employees "engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 203(j), a definitional section of the Act, enlarges the meaning of the terms used in §§ 206, 207, by providing that

" * * * for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, *or in any closely related process or occupation directly essential to the production thereof,* in any State." (Emphasis added.)

In interpreting the predecessor of the "directly essential" language of § 203(j), which predecessor used the term "necessary to the production" of goods for commerce, the Supreme Court held in Armour & Co. v. Wantock, 323 U.S. 126, 129, 65 S.Ct. 165, 89 L.Ed. 118 (1944) that § 203 (j) was not to be given a restricted meaning and that firemen engaged by facilities used for the manufacture of goods

for interstate commerce were employed in an occupation "necessary to the production" of goods for commerce. In the earlier case of Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942) the Supreme Court had given § 203(j) a liberal interpretation in holding that firemen, watchmen, porters, and carpenters employed by the owners of buildings whose tenants were engaged in the production of goods for interstate commerce were engaged in "occupation[s] necessary to the production" of goods in interstate commerce. A case from this circuit is even more directly analogous to the situation here. Although recognizing that the 1949 amendment to the Fair Labor Standards Act which changed the language of § 203(j) from "necessary to the production" to "directly essential to the production" of goods for commerce was intended to narrow the coverage of the Act, this court held in General Electric Co. v. Porter, 208 F.2d 805 (9th Cir. 1954) that privately employed community firemen whose duties included the protection of a small number of buildings whose occupants were the executives and administrators of a plant engaged in production of goods for commerce were engaged in occupations closely related and directly essential to production of goods for commerce.

In light of the authority above cited it seems an established legal proposition that the firemen in this case were engaged in an occupation within the coverage of § 203(j) if they proved that the fire protection which they were hired to provide was used to protect establishments engaged in the production of goods for interstate commerce. The district court found that a substantial number of appellant's customers were engaged in such production, that the contracts for fire protection with those customers were at substantial compensation to the appellant, and that the fire protection thus afforded to the customers was directly essential to the activities of such customers in the production of goods for interstate commerce.

We have reviewed the findings of the district court, the evidence supporting those findings, and the law concerning the allegations of error made by appellant on this phase of the case, and cannot agree that error was committed.

Of the total number of accounts which appellant had, only 277 were non-residential. Among these non-residential accounts were such significant customers shown to be engaged in production of goods for interstate commerce or to be engaged in interstate commerce, as General Electric, Motorola, Sperry-Phoenix, General Motors, and Mountain States Telephone and Telegraph Company.[1] These accounts paid the following amounts per year to appellant: Sperry-Phoenix, $500; Mountain States Telephone and Telegraph, $160; General Electric, $440.80; General Motors, $121; Motorola, $506. We have been cited to no evidence in the record as to the total income of appellant or to the income from all non-residential accounts. Testimony that appellant's fire protection was a necessary and essential part of the customers production of goods for interstate commerce was elicited from representatives of Motorola, General Electric, and Mountain States Telephone and Telegraph.

The evidence in the record supports the findings of the district court; and the cases in this area support the legal sufficiency of the evidence upon which the findings were grounded. As the court said in Mitchell v. Independent Ice & Cold Storage Company, 294 F.2d 186, 190 (5th Cir. 1961), in which the sufficiency of small deliveries of ice to shrimp

1. The parties, by stipulation in the pretrial order in the court below, agreed that some of the companies which utilized appellant's fire protection services were engaged in interstate commerce. The appellant now claims that the stipulation was broadly phrased and did not include . agreement that the companies' particular protected Arizona facilities were engaged in activities affecting interstate commerce. We cannot sustain this contention. The stipulation must be interpreted in the light of the issue to which it was directed.

packing concerns was questioned as a basis for holding that employees of the ice company were entitled to the protection of the Act:

"It is immaterial that the ice so furnished was but a very small percentage of Independent's overall business. [citing cases] The de minimis doctrine which is applicable, if at all, only where deliveries of goods are sporadic and of insubstantial amounts, has no application here."

See also Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L. Ed. 607 (1946), where it was held that a publishing company of whose product only one-half of one per cent went out of state was engaged in the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act. Again most nearly in point in this regard is this circuit's decision in General Electric Co. v. Porter, supra. At 208 F.2d 810 the court made this pertinent observation:

"The only distinction between the instant case and Borden Co. v. Borella [325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865], supra, lies in the fact that here the employees are hired to protect not only the administrative offices of the plant but also the entire communities of Richland and North Richland. This distinction does not detract from the relationship of the essential duties to the administrative offices and this service distinguishes cases cited by General Electric, such as (citing cases.) *Moreover, the Act does not require that an employee be employed exclusively in the particular occupation.* Roland Electric Company v. Walling, 1945, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383." (Emphasis added.)

■ We hold that the evidence supports the district court's findings that appellant's protection of businesses engaged in the production of goods for interstate commerce, or engaged in interstate commerce, was sufficient to bring its employees within the coverage of the Fair Labor Standards Act.

II. Sufficiency of Evidence as to Number of Hours Worked.

Appellant argues that appellees did not introduce sufficient evidence of the number of hours of regular and overtime which they had worked upon which to base a computation of how much they had been underpaid. In making this argument appellant takes issue with the district court's findings and conclusions that the appellant's own business records were an adequate source of information upon which to determine the hours worked, and that the time swapping engaged in by the employees did not deprive appellant of any work hours.

■ In support of this attack, appellant cites Eakins v. Alvarado Broadcasting Co., 125 F.Supp. 87 (D.N.M.1954); Neal v. Braughton, 111 F.Supp. 775 (W. D.Ark.1953); and Davies v. Onyx Oils and Resins, 63 F.Supp. 777 (D.N.J.1946) for the proposition that the burden is on appellees to produce evidence of the hours worked from which to determine the amount they have been underpaid. These cases do indeed stand for such a proposition, but also state that the plaintiffs' evidence need only be adequate to provide a reasonable approximation or inference as to the amount of time worked. Eakins v. Alvarado Broadcasting Co., supra; Neal v. Braughton, supra.

■ After reviewing the evidence of hours introduced by appellees and the testimony as to "time-swapping," we cannot agree that the findings of the district court are clearly erroneous or that it misapplied the law in determining that appellees had satisfied the burden placed upon them to provide a reasonable approximation of the hours worked.

■ The use by the district court of appellant's own time records to prove the number of hours worked was proper. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–688, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), points out that the Fair Labor Standards Act places on the employer the duty to keep such records and the employees have no such duty. 29 U.S.C. § 211(c). That case also estab-

lishes that the use of the employer's records to establish the amount of time worked is proper, and that if the employer has kept proper and accurate records the employees' burden of proof is discharged by merely producing those records. That is what the appellees did in this case, and we agree with the district court that since the records were kept in accordance with the practices of the employer and not those of the employees, and since the employer had found the records adequate for years for purposes such as income tax, social security, and insurance, it can hardly now claim that its records are improper. But even if we were to agree that the records which were kept by appellant were not accurate, the appellant would not be helped, for the Anderson v. Mt. Clemens Pottery Co. opinion goes on to state that where the employer has kept poor records the employees need only establish the amount of work performed as a matter of reasonable inference. Here the records, kept by management (Chiefs Camp and Robertson), provide an adequate basis upon which to determine the hours worked and in light of its long continued reliance on these records for a variety of purposes, appellant's efforts to impeach them were a failure.

Nor can we disagree with the district court's findings as to the swapping of time. Testimony at the trial indicated that the practice was known, accepted, and acquiesced in by appellant and had taken place for years. Under the loose employment arrangement by which the students were employed, it appears that the time swapping has received the sanction of at least one court. Mitchell v. Strickland Transportation Company, 228 F.2d 124 (5th Cir. 1955). Here the appellant failed to show that it had been damaged in the least by the swapping arrangement, and has failed to tell us why the finding regarding time swapping is clearly erroneous.

III. Interpretation of the Employment Agreement.

The testimony of appellees, never contradicted by appellant, was that the employment contract was an oral agreement and was never reduced to writing. Nevertheless, the testimony of appellees disclose that they all had a similar understanding of the agreement, which we have summarized in the statement of facts, supra.

The district court in this case made no findings regarding the employment agreement and it does not appear that he considered the questions of whether or not sleeping time should be counted as working time and whether some of the benefits provided to the employees were to be considered as compensation in addition to the monetary wages paid. In Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Supreme Court stated that it is the court's duty to look to the employment agreement to determine what the parties intended, and where that is impossible it becomes the duty of the court to look to the circumstances to determine what was intended. As the Court stated in Skidmore v. Swift & Co., supra, 323 U.S. at 137, 65 S.Ct. at 163, "The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was."

The rule of *Skidmore,* supra, was applied by this court in General Electric Co. v. Porter, supra. In that case this court held that the sleeping time involved was working time, but pointed out two factors which should always be considered in making such a determination: (1) whether the agreement of the parties had specifically dealt with the point, and (2) whether the employees permanently lived at the work premises or were merely sleeping there while on duty as part of the duty and not as a matter of choice.

In viewing the tests laid down in *Skidmore,* supra, and General Electric Co. v. Porter, supra, in light of the facts proved in this case, we are of the opinion that the district court erred in counting as compensable working time the eight hours of sleeping time allowed the employees while on duty during their alter-

nate-day shifts from 4:30 P.M. to 8:00 A.M. and the sleeping period during the 24 hour Sunday shifts, without attempting to interpret the employment agreement to determine the intent of the parties regarding sleeping time. The circumstances of this case do not present a situation such as that existing in General Electric Co. v. Porter, where the firemen all had homes which they had to leave while on duty, and slept at the fire house only because it was part of their duty time. Here the men lived permanently at the fire station and slept there even on the alternate days when they were not on duty. While it is true that the employees were subject to call at any time during the eight hour sleeping period during the alternate days that they were on duty, the situation may be more nearly like that in *Skidmore,* supra, where the men "waited to be engaged" rather than being "engaged to wait." We have noted the men here were paid for fire fighting time after the first hour when roused from bed to fight fires during their eight hour sleeping period. We believe that the district court erred in failing to interpret the employment agreement to determine if the sleeping time which the men enjoyed without interruption was or was not compensable time. Numerous cases have held that sleeping time in circumstances similar to the situation here present, even when subject to the possibility of interruption by a call to duty, is not compensable time. Armour & Co. v. Wantock, supra; Skidmore v. Swift & Co., supra; Bowers v. Remington Rand, 159 F.2d 114 (7th Cir. 1947); Bell v. Porter, 159 F.2d 117 (7th Cir. 1947); Bridgeman v. Ford, Bacon & Davis, 64 F.Supp. 1006 (E.D. Ark.1946).

■ A further issue concerning the interpretation of the employment agreement is whether the living accommodations provided by the employer were intended as part of the compensation, and should have been taken into account by the district court in determining the amount of compensation received by the appellees. As the Supreme Court observed in Skidmore v. Swift & Co., supra, 323 U.S. at 137, 65 S.Ct. at 163, "Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation." Since the district court in the present case failed to interpret the employment agreement in order to determine whether or not the accommodations were intended as part of the compensation, he failed to comply with the mandate of Skidmore v. Swift & Co., supra, of "finding what the arrangement was."

On the issues of the compensability of sleeping time and the intent of the parties as to the living accommodations furnished to the employees, we remand to the district court with instructions to interpret the employment agreement concerning these issues. Should the district court determine that the living accommodations were intended as partial compensation, the district court must then determine the reasonable value of the living accommodations as compensation.

IV. Was the Amendment to the Complaint Barred by the Statute of Limitations?

The original complaint in this suit was filed on June 16, 1961. Wages were claimed for various employees for periods from September 5, 1959 to April 30, 1960. 29 U.S.C. § 255(a) sets up a two year statute of limitations during which actions under the Fair Labor Standards Act must be brought. It will be observed that all of the claims on wages in the original complaint fit within that two year statute.

However, during the course of the trial the plaintiffs sought and were granted leave to amend their complaint to include their last pay period with the employer, which was between April 30 and May 19, 1960. Appellant argues that they filed the amended complaint more than two years after the cause of action accrued, and so it is barred. The district court did not accept this view and allowed

wages for the full period prayed for in the amended complaint. It is to be noted that although appellant alleges that the amendment was filed after the two year bar had taken effect, and appellee seems to agree, neither mentions the date on which the amendment was filed and neither designated the amended complaint as part of the record on appeal.

■ The action of the district court was correct. Appellant's argument completely overlooks Rule 15(a), (c) of the Federal Rules of Civil Procedure. Rule 15(a) permits amendment by leave of court, and Rule 15(c) provides:

"(c) *Relation Back of Amendments.* Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, *the amendment relates back to the date of the original pleading.*" (Emphasis added.)

1A Barron and Holtzoff, Federal Practice and Procedure § 448 (Wright Ed. 1960) makes it clear that the purpose of Rule 15(c) is to defeat the bar of statutes of limitations, and is liberally applied especially if no disadvantage will accrue to the opposing party. As § 448 of the treatise states:

"If the evidence tending to support the facts alleged in the amended complaint could have been introduced under the former pleading, the amendment is not objectionable. (Citing cases.)

\*     \*     \*     \*     \*     \*

"The fundamental question is whether the defendant has been put on notice with regard to the claim against him raised by the amended pleading. (Citing cases.)"

■ Here there can be no question but that the amended pleading was based on the same transaction, was to be proved by the same kind of evidence (appellant's time records), and did not take appellant by surprise. Rule 15(c) applies to relate the amendment back and thus defeat the two year statute of limitations.

V. Was the Allowance of Attorney's Fees Barred by the Arizona Statute of Limitations?

The district court, in awarding judgment for appellees, allowed them attorney's fees in the amount of $2250 in accordance with the provision of 29 U.S.C. § 216(b) that "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Appellant does not take exception to the amount of the attorney's fee, but asserts that it should be disallowed altogether on the basis of an argument that the two year statute of limitations of 29 U.S.C. § 255(a) refers only to actions for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, and makes no reference to a bar on the recovery of attorney's fees; there is therefore (urges the appellant) no federal statute of limitations in this action as to attorney's fees and we must look to state law; that Arizona Revised Statutes § 12-541 providing a one year statute on actions "upon a liability created by statute, other than a penalty or forfeiture" is therefore applicable and the claim for attorney's fees is barred.

■ While we have found no cases on this novel point, we reject appellant's argument on the ground that if accepted it would read the allowance of attorney's fees out of the Act. The two year statute of limitations in 29 U.S.C. § 255 refers to wages and liquidated damages recoverable under 29 U.S.C. § 216. The language of § 216 makes it plain that the attorney's fees provided in that section are part of the wage and damage award. No separate action is maintainable under the Act for the collection of attorney's fees—they are either recoverable as part of a wage and liquidated damage award under § 216 or not at all. We thus find that the two year statute of limitations of § 255 is applicable in regard to attorney's fees also. Appellant's argument might have some merit if attorney's fees were recov-

erable in a separate action. That not being the case, appellant's argument creates a manifest inconsistency in the application of § 216. It would create the anomalous result of requiring a plaintiff to seek to collect his attorney's fees before he had to bring a claim for wages, in connection with which the attorney's fees would be generated. We decline to so emasculate the § 216 allowance of attorney's fees, we find no error in the district court's allowance of attorney's fees.

Affirmed in part, remanded in part, with instructions.