GENERAL ELECTRIC CO.
v.
PORTER.

PORTER
v.
GENERAL ELECTRIC CO.
No. 13603.

United States Court of Appeals
Ninth Circuit.

Dec. 7, 1953.

Rehearing Denied Jan. 11, 1954.

9. Cf. Acts, Ch. 9.

Metzger, Blair, Gardner & Boldt, Hilton B. Gardner, John W. Blair, Tacoma, Wash., for appellant-appellee General Electric Co.

Horrigan, Merrick, Peterson & Merrick, John Horrigan, Ivan Merrick, Theodore D. Peterson, Florence Mayne

Merrick, Pasco; Wash., for appellee-appellant Averille L. Porter.

Before STEPHENS, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

Averille L. Porter brought an action under the Fair Labor Standards Act, as amended, 29 U.S.C.A. § 201 et seq., hereafter the Act, to recover on behalf of himself and fifty-five other employees overtime pay, liquidated damages and attorneys' fees alleged to be due from employer General Electric Company, hereafter General Electric. Judgment was rendered in favor of plaintiff Porter and his assignors, hereafter referred to as the firemen, in the amount of $15,212.35 and $5,000 attorneys' fees. General Electric in its appeal contends that the employees were not covered by the Act. The firemen also appeal claiming they were denied the full amount of compensation to which they were entitled.

Four questions are presented for consideration: (1) Were the firemen here involved covered by the Act? (2) Did the trial court err in determining the regular hourly rate of pay and the amount of overtime compensation due the firemen? (3) Was it error to exclude sleeping time in computing work time compensable under the Act? (4) Were the firemen entitled to liquidated damages?

### 1. Applicability of the Act to the Firemen.

Defendant General Electric operates Hanford Works, a government owned plant engaged in the production of plutonium for military use, under contract with the Atomic Energy Commission, hereafter the Commission, for cost plus a fixed fee of ten cents a year. Hanford Works occupies approximately 650 square miles of a government owned area located in Benton, Franklin, Grant, Adams and Yakima Counties in the State of Washington. Ownership and title to all land, buildings, equipment, raw materials and the finished product is in the United States. More than one-half of the plutonium produced at Hanford was distributed or intended for distribution by the Commission to points outside the State of Washington.

The plant area is surrounded by a barricade with inner barricades enclosing separate production units within the plant. The plant has its own specially trained fire department under the supervision of the manager of the plant utilities and general services department. The plant fire department is separate and distinct from the community fire departments located at Richland and North Richland, the latter being under the control and supervision of the community manager. While the community fire departments do not directly protect the plant area, they are subject to call in the event of emergencies and the record discloses that on several occasions they were actually called to points inside the barricaded area.

The firemen here involved were employed by General Elctric at three separate fire stations in the communities of Richland and North Richland in Benton County, Washington. The two communities are located some distance from the production plant at the southern tip of the federally-owned area at the confluence of the Yakima and Columbia Rivers. The production unit nearest Richland is some seven miles distant. The two communities were built to house and care for the needs of the employees of Hanford Works. All the land and buildings therein are owned by the United States and leased to private persons by General Electric on behalf of the United States. The communities are governed and operated by a community manager who is an employee of General Electric. They are typical small towns having the usual stores, churches, banks, post office, schools, parks, Greyhound bus depot, Railway Express Agency, etc. Richland covers an area of about 4½ square miles and has a population of some 25,000 persons. North Richland has a fluctuating population of from 6,000 to 10,000 persons and covers an area of about 2½ square miles.

There are no production facilities in either Richland or North Richland. However, there is located in Richland an area of about four square blocks known as the "700 Area" containing the administrative and executive offices of General Electric and the Commission.[1] The manager and director of the entire Hanford Works has his offices in the "700 Area" and some 1,000 to 2,000 administrative and executive personnel work there. The whole area comprises some twenty-seven different buildings. Also located in Richland is a plant bus terminal and repair shops operated by General Electric, a hospital where plant employees receive physical examinations, an interstate telephone and teletype system, and an auto freight depot where interstate shipments are received. In North Richland General Electric and the Commission maintain certain administrative offices. General Electric operates a plant railroad which runs through North Richland connecting the plant area with the Union Pacific and Northern Pacific Railways. Considerable plant railroad equipment is located at North Richland, and a marshaling yard maintained between Richland and North Richland. There is a warehouse on the rail line in North Richland but the record does not disclose who owned and operated it. Freight came in over the plant railroad and substantial quantities of surplus and rejected building materials and construction equipment were shipped to points outside the state. There is a lumber yard and piles of construction material in North Richland, some of which is used at Hanford Works. The Commission has a private airport in the vicinity used exclusively by government planes. The firemen stand by at the airport during takeoffs and landings.

All of the structures and facilities mentioned above along with all of the residences and commercial establishments and other property in the two communities are protected by the firemen involved in the instant case.

On the basis of the above facts, the trial court held, and we think properly so, that the community firemen were covered by the Act. The court made the following relevant findings of fact: (1) General Electric was engaged in the production of goods for commerce since a large part of the plutonium produced at Hanford Works was distributed to points outside the State of Washington. (2) Although the firemen were not directly protecting the plant area, they were protecting the administrative portion of the plant and were therefore engaged in an occupation closely related and directly essential to the production of goods for commerce. (3) The firemen guarded and protected instrumentalities of commerce, namely, a railroad, a telephone exchange, an express depot, and bus and freight terminals.

General Electric concedes that it was engaged in the production of goods for commerce. It contends, however, that even though it produces goods for commerce, the duties of the community firemen do not bear such a relationship to that production as to bring them within the coverage of the Act.

▮ An employee is covered by the Act as amended if he is in an occupation "closely related" and "directly essential" to the production of goods for commerce.[2] The employee's work need not

---

1. More precisely, the "700 Area" includes the Atomic Energy Commission Security Officer's offices, a telephone exchange, the general offices of General Electric and the Commission, conference rooms, Instrument Development Laboratory, offices and shops of Community Division, Accounting Offices, Engineering Offices of General Electric and the Commission, and the Offices of the Federal Bureau of Investigation.

2. " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential

be indispensable to production. Roland Electric Company v. Walling, 1945, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383. Watchmen, engineers, firemen, carpenters and other maintenance personnel employed in a building where goods are physically manufactured or processed for commerce come within the coverage of the Act. A. B. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Armour & Co. v. Wantock, 1944, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118. In Borden Company v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865, the Supreme Court not only reaffirmed its position in the Kirschbaum case but extended it. It was there held that officers and administrative personnel working in an office building owned and operated by a producer of goods for commerce are actually engaged in the production of goods, and employees who service and maintain such building are engaged in an occupation necessary to that production and come within the coverage of the Act. The factual situation of this and the Borden case is similar. Just as the heart of the Borden enterprise lies in its central office building where the entire business was supervised, managed and controlled, so here the heart of Hanford Works lies in the administrative area located in Richland and North Richland. Substantially the same activities carried on in the Borden office building were carried on in the Hanford administrative offices. The language of the Supreme Court is particularly apt.

"In this building the directors meet and the corporate officers conceive and direct the policies of the company. Although geographically divorced from the manufacturing plants, employees working in this building dictate, control and coordinate every step of the manufacturing processes in the individual factories. By means of direct teletype wires, they maintain detailed and meticulous supervision of the plants, the local superintendents exercising discretion only in the conduct of routine matters. While no products are actually processed or sold in the building, the purchase of raw materials and supplies, the methods of production, the amounts to be produced, the quantity and character of the labor, the safety measures, the budgeting and financing, the legal matters, the labor policies and the maintenance of the plants and equipment are all directed from this building. Such are the activities of petitioner's central office which is maintained, serviced and guarded by the respondent employees." Borden Company v. Borella, 325 U.S. 679, 681, 65 S.Ct. 1223, 1224, 89 L.Ed. 1865.

■ The only distinction between the instant case and Borden Co. v. Borella, supra, lies in the fact that here the employees are hired to protect not only the administrative offices of the plant but also the entire communities of Richland and North Richland. This distinction does not detract from the relationship of the essential duties to the administrative offices and this service distinguishes cases cited by General Electric, such as Wilson v. Reconstruction Finance Corporation, 5 Cir., 1947, 158 F.2d 564, certiorari denied 331 U.S. 810, 67 S.Ct. 1199, 91 L.Ed. 1830, and Morris v. Beaumont Mfg. Co., D.C.S.C., 1947, 84 F.Supp. 909. Moreover, the Act does not require that an employee be employed exclusively in the particular occupation. Roland Electric Company v. Walling, 1945, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383.

It cannot be said that the protection of the administrative offices of Hanford Works is only an incidental duty of the firemen whose primary duty is to protect the rest of the communities. The administrative area is an integrated part of the communities and the protection of

to the production thereof, in any State." 29 U.S.C.A. § 203(j). Prior to the 1949 amendments to the Act, an employee was covered if he was in an occupation "nec-

essary" to production of goods for commerce. 52 Stat. 1060 (1938), 29 U.S. C.A. § 203(j).

some twenty-seven buildings housing the directing genius of the enterprise is a substantial part of the duties of the firemen. The fact of the matter is that the communities as an integrated whole are vital to the operation of Hanford Works. They were built expressly to house and care for the needs of the plant employees. It may be argued that the communities were not indispensable to plant operation. Yet they serve a valuable function and in the event they were destroyed by fire the smooth functioning of the plant would be interrupted; the plant would have considerable difficulty functioning without such facilities as the telephone exchanges, the express and passenger bus terminals, the railroad with its warehouse and classification yards, the post office, the auto freight depot, the airport, the plant bus depot and garages, and hospital. While protection of the administrative facilities is closely related and directly essential to production, protection of the other property in Richland and North Richland, to a lesser degree perhaps, has a direct bearing on the operation of Hanford Works. It is not as though the firemen were protecting property wholly unrelated to the plant.

While Borden Company v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L. Ed. 1865, was decided prior to the 1949 amendments to the Act, the logic of that opinion still applies to the instant case. The legislative history, interpretations of the Administrator of the Wage and Hour Division, and court decisions convince us that the employees such as here involved were not removed from the coverage of the Act by the amendments. Tobin v. Union Nat. Bank of Little Rock, D.C.Ark.1953, 112 F.Supp. 702; 15 Federal Register 2925, Section 776.-17, 776.18; Statement of the Managers on the Part of the House, H.R. Report No. 1453, 81st Congress, 1st Session, Oct. 17, 1949.

We think the fact that the firemen not only protected the communities from fire, but also served in a stand-by capacity to protect the production area in the event of emergency, is significant. General Electric operated and managed both the plant and the communities and the community firemen were at all times on call subject to the direction of General Electric. It is apparent that they could be ordered to assist the plant firemen if need arose and, in fact, did respond on several occasions to calls from the plant.

### 2. Regular Hourly Rate of Pay and Computation of Overtime.

Under the Act as amended, an employer is required to pay all covered employees a regular hourly rate of pay which is at least equal to the statutory minimum plus one and one-half times the regular rate of pay for all hours worked in excess of forty hours a week. 29 U.S.C.A. §§ 206(a), 207(a).[3] Hence, we have for determination two basic factual issues usually found in every wage and hour case, namely: (1) what was the regular rate of pay for the firemen, and, (2) what was the total number of hours they worked? We summarize the evidence bearing on these two issues.

Prior to March 20, 1950, General Electric maintained twenty-four hour fire protection for the communities of Richland and North Richland under an alternating three-shift system whereby each shift of firemen worked approximately eight hours a day. Pursuant to individual oral contracts made at the time of employment, the firemen were paid a fixed hourly wage for a forty-hour week with time and one-half for overtime. Commencing March 20, 1950 and without consultation or agreement with the firemen, General Electric, as an economy measure, unilaterally initiated a change to the so-called two-platoon system. Under the new arrangement, the firemen are on duty for a 24 hour shift, off 24 hours, with each sixth shift off. They were paid a fixed month-

---

3. The statutory minimum wage in effect during the period in question was seventy-five cents an hour.

ly wage regardless of the number of hours worked. In $\frac{1}{4}$ of the weeks they were required to be at the fire station 48 hours, in $\frac{1}{2}$ of the weeks 72 hours, and in $\frac{1}{4}$ of the weeks 96 hours. No provision was made for overtime pay and no overtime compensation was paid them subsequent to the change-over. General Electric benefited from the new arrangement since the same fire protection was given under the two-platoon system with only two-thirds the number of men as was had under the three shift system. The firemen worked longer hours for approximately the same wage as paid them under the three shift employment contract.

The firemen knew well in advance that the change-over was to take place. They raised objection both prior to and subsequent to the change. They sought a meeting with the company for the purpose of discussing the situation. This was refused. The firemen began and continued to work under the new conditions. They attempt to justify their action in this regard on the ground that jobs were scarce and they were reluctant to employ the economic weapon of a strike in a plant engaged in the production of the vitally needed plutonium. They decided to continue to work and in the meantime seek legal advice as to their rights.[4]

The duties of the firemen at the fire station were similar to those of a typical municipal fire department. They reported to work at 8:00 a. m. and were required to remain in the station at all times during the twenty-four hour shift. The men ate and slept at the station and were subject to call at all hours. Part of their duties consisted of standing a telephone watch once every fourteen days. The telephone watch was from 11:00 p. m. to 7:00 a. m. at all three fire stations. The men at Richland stood four shifts of two hours each while the men at North Richland stood two shifts of four hours each. Men on telephone watch were permitted to retire early and the others could retire after 9:00 p. m. with a 7:00 a. m. rising hour.

The trial court found that the firemen worked a fluctuating workweek for a fixed monthly salary and were entitled to overtime pay for all hours actually worked in excess of forty in any workweek. The regular hourly rate of pay of each fireman was computed by multiplying his monthly wage by 12 and dividing the result by 52 to ascertain his weekly wage; then dividing the weekly wage by the number of hours actually worked in the particular workweek. The firemen having received straight time compensation for all hours worked, the trial court held that they were entitled to recover only halftime for all hours actually worked in excess of forty in any workweek.

The method adopted by the trial court in calculating the overtime compensation is an approved procedure. It is true that where an employee is paid a fixed monthly wage, the longer the hours worked, the less are the earnings per hour. However, this method of computing overtime for a fixed salary and fluctuating workweek has been approved by the Supreme Court and despite the passage of some eleven years, Congress has not seen fit to amend the Act. Overnight Motor Transportation Co. v. Missel, Inc., 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682.

The firemen do not challenge the correctness of the method used by the trial court. They admit this to be proper if in fact they were working at a fixed monthly wage. They urge, however, that their employment was not at a fixed monthly wage since they at no time agreed to the new arrangement, that it was made over their protest and that it violates the Act. They argue that the trial court should have based its computation of overtime upon the hourly rate at which they had been employed prior to March 20, 1950, the only employment contract, they assert,

4. The date the firemen employed counsel does not appear in the record.

that was made with the company. We cannot agree.

■ At the time the two-platoon system was instituted an entirely new employment contract was created. Admittedly there is no evidence of express acceptance of the new system. It is elementary, however, that acceptance may be made by express words or by conduct. The men reported to work as ordered and worked pursuant to the new schedule. General Electric discontinued paying the hourly wage with overtime and the employees continued to work on a monthly basis. The firemen, no matter what may have motivated them in remaining at work, cannot now be heard to say that they did not acquiesce in the new arrangement. We hold that as a matter of law the unilateral action of the employer was impliedly accepted by the firemen and that a new contract was created whereby the employees agreed to work on a two-platoon system at a fixed monthly wage. Williams v. Jacksonville Terminal Co., 1942, 315 U. S. 386, 62 S.Ct. 659, 86 L.Ed. 914; Shepler v. Crucible Fuel Co., 3 Cir., 1944, 140 F.2d 371; Peffer v. Federal Cartridge Corporation, D.C.Minn.1945, 63 F. Supp. 291.

■■ It has been repeatedly stated that there is nothing unlawful about paying a fixed salary for a fluctuating workweek, and a change from a regular hourly rate under a three-shift system to a monthly wage under a two-platoon system does not violate the Act. Overnight Motor Transportation Co., Inc., v. Missel, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Bowers v. Remington Rand, Inc., 7 Cir., 1946, 159 F.2d 114, certiorari denied 331 U.S. 864, 67 S.Ct. 1198, 91 L.Ed. 1869; Shepler v. Crucible Fuel Co., 3 Cir., 1944, 140 F.2d 371. It is true that the new plan under consideration here does not come within the exception created by § 7(e) of the Act and, hence, § 7(a) was violated when the firemen were required to work more than forty hours a week without overtime compensation.[5] But this fact does not vitiate the new contract and automatically restore the previous hourly basis of employment. The trial court correctly held that insofar as the new plan falls short of the requirements of the Act the firemen are entitled to recover compensation and damages under § 16 of the Act. 29 U.S.C.A. § 216 (b). General Electric has never maintained that it was operating the fire departments under the Belo-type plan codified by § 7(e) of the Act. See, Walling v. A. H. Belo Corporation, 1942, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. It conceded that in the event the firemen were covered by the Act they were entitled to overtime pay for all hours worked in any work week in excess of forty. The terms of the new contract were not expressly stated insofar as mention of overtime is concerned. This omission is not fatal. The provisions of the Fair Labor Standards Act will be read into the contract to grant

---

5. 29 U.S.C.A. § 207.

"§ 207. Maximum hours.

"(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

 \* \* \* \* \* \*

"(e) No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of forty hours if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in section 206(a) of this title and compensation at not less than one and one-half times such rate for all hours worked in excess of forty in any workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified."

the employees the right to overtime compensation.

### 3. Sleeping Time.

The firemen were permitted to sleep a portion of the time they were on duty at the fire station. The question posed is, did this time constitute hours worked within the meaning of the Act? The trial court found that the time spent at the fire station was work time except the eight-hour sleeping period but including time spent during the sleeping period on alerts, alarms, or telephone watches. The firemen claim that all the time spent at the fire station was time worked.

The ultimate determination of whether or not sleeping time is work time presents a mixed question of law and fact. In reviewing such a mixed question we may substitute our judgment for that of the trial court. Bell v. Porter, 7 Cir., 1946, 159 F.2d 117, certiorari denied 330 U.S. 813, 67 S. Ct. 1092, 91 L.Ed. 1267. That sleeping time may be work time under appropriate circumstances is well settled. In Armour & Co. v. Wantock, 1944, 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L. Ed. 118, the Court said:

> "Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case."

In Skidmore v. Swift & Co., 1944, 323 U.S. 134, 137, 65 S.Ct. 161, 163, 89 L. Ed. 124, the Supreme Court considered the question of whether firemen are entitled to be paid for waiting and there set out various factors to be taken into account in making the determination:

> "* * * This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was."

It is apparent from the above quoted language that whether or not sleeping time falls within the Act depends upon the express or implied agreement of the parties, and in the absence of an agreement, the nature of the service and its relation to the waiting time. An employer and his employees may by agreement settle the question whether certain activity or nonactivity constitutes work within the meaning of the Act. Bowers v. Remington Rand, Inc., 7 Cir., 1946, 159 F.2d 114; see Tennessee Coal, Iron & Railroad Co., v. Muscoda Local No. 123, 1944, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 749. Where the arrangement is mutually satisfactory to employer and employee the contract does not violate the Act. In the instant case there was no agreement or understanding between the firemen and General Electric with regard to compensation for sleeping time. The change to the two-platoon system was made without discussion as

to whether or not time spent sleeping was to be compensated. General Electric considered the firemen as being outside the coverage of the Act and obviously did not concern itself with the question of sleeping time. However, payment of the monthly wage without indicating that the compensation was for only sixteen of the twenty-four hours spent at the fire station indicates a belief on the part of General Electric that it employed the firemen for the full twenty-four hour shift. The action of the firemen in protesting the change-over and the commencement of this action is evidence of a belief on their part that sleeping time was time worked for which they were entitled to be compensated.

The absence of an express or implied agreement in this case as to sleeping time and the change to the two-platoon system over the objection of the firemen distinguishes this case from those instances where compensation for sleeping time has been disallowed. Bowers v. Remington Rand, Inc., 7 Cir., 1946, 159 F.2d 114, certiorari denied 331 U.S. 864, 67 S.Ct. 1198, 91 L.Ed. 1869; Rokey v. Day & Zimmermann, 8 Cir., 1946, 157 F.2d 734, certiorari denied 330 U.S. 842, 67 S.Ct. 1082, 91 L.Ed. 1288. In the cases where sleeping time has been denied as compensable work time the employees had voluntarily entered into employment contracts which expressly provided that they would be paid only for sixteen out of the twenty-four hours that they were required to remain on the employer's premises subject to call. Bell v. Porter, 7 Cir., 1946, 159 F.2d 117, certiorari denied 330 U. S. 813, 67 S.Ct. 1092, 91 L.Ed. 1267; Plummer v. Harvester War Depot, Inc., D.C. Ohio, 1947, 70 F.Supp. 495; Eustice v. Federal Cartridge Corporation, D.C.Minn.1946, 66 F.Supp. 55.

Considering the nature of the service performed by the firemen, we conclude that the firemen were engaged to wait; that their compensation covered both waiting and task, and that the living quarters were furnished as a facility of the task. As previously stated, the firemen were required to remain at the station for the entire twenty-four hour shift ready to answer alarms at any hour of the day or night. They were as completely under the direction of General Electric during the eight-hour sleeping period as during the other sixteen hours of the shift. They were on the employee's premises at night primarily for the benefit of General Electric and as the only effective means to provide twenty-four hour fire protection for the communities of Richland and North Richland. During the hours that they were at the fire station they were not free to do as they would. The sleep allowed was a fitful one at best, which might be said to have been with one eye open in anticipation of the moment they would be called upon to jump to the response of an alarm. The trial court found that the sleeping facilities provided were adequate. We may consider that finding as not being clearly erroneous. That fact in itself is not determinative as to the compensability of the sleeping time. It would be of importance in the case of an agreement that sleeping time would not be considered work time.

We are impressed by a further fact which distinguishes this case from other cases involving firemen where sleeping time was disallowed. In the other cases the firemen worked for a plant fire department and they were employed solely to protect the plant area. Bowers v. Remington Rand, Inc.; Rokey v. Day & Zimmermann; Bell v. Porter; Plummer v. Harvester War Depot; Eustice v. Federal Cartridge Corporation, supra. Here the firemen protect two populous communities of some 30,000 persons covering a wide area. Under such circumstances the probability of an alarm at night is far greater than that involved in the protection of an industrial plant.

We have examined Interpretative Bulletin No. 13 of the Administrator of the Wage and Hour Division of the Depart-

ment of Labor and find nothing therein inconsistent with our conclusion that in the instant case sleeping time was compensable. The examples given by the Administrator where waiting time is not properly counted as work time are quite different from the facts of this case. An operator of a small telephone exchange where the switchboard is in her home is not entitled to compensation for sleeping time. The difference between living and sleeping in one's home and sleeping in a fire station dormitory is apparent. The Administrator may be quite correct in excluding sleeping hours of a pumper at a stripper well, or a watchman of a lumber camp who are on duty twenty-four hours but who make their homes on their employer's premises. Unlike the pumper or the watchman at the lumber camp, the firemen do not maintain homes on the employer's premises but are required to leave their homes and sleep at the fire stations.

Inclusion of the eight-hour sleeping time in those weeks when the firemen were at the fire station ninety-six hours results in some of them, at least, receiving an hourly wage below the minimum provided by the Act. This is a matter which the trial court will consider in revising its judgment to conform with our holding that the firemen are entitled to compensation for sleeping time.

### 4. Liquidated Damages.

 The firemen claim they are entitled to recover liquidated damages. Under § 11 of the Portal to Portal Act of 1947, 29 U.S.C.A. § 260, if the failure to pay overtime compensation was in good faith, and the employer had reasonable grounds for believing that his omission was not a violation of the Act, the court may in its discretion deny liquidated damages. The trial court found that General Electric had acted in good faith and upon reasonable grounds and refused liquidated damages. Appellant asserts that this finding lacks substantial support in the evidence. We do not so read the record.

 The record discloses that the administrative personnel and attorneys for both General Electric and the Atomic Energy Commission studied for a long period of time the question whether the Act was applicable to these firemen. After extensive research and numerous conferences, the attorneys for General Electric rendered an opinion that the firemen were excluded from the coverage of the Act. Relying on this advice, General Electric thereupon instituted the two-platoon system. The opinion of the attorneys upon which General Electric relied was not an unreasonable one in view of the uncertain state of the law as to whether General Electric was engaged in "industry" or "engaged in production of goods for commerce" or whether the firemen were in an occupation "closely related" and "directly essential" to such production. This is a case poised on the border-line of coverage and noncoverage. General Electric acted throughout in the firm belief that the Act did not apply. A subsequent determination that the advice was wrong does not deprive the employer of the relief provided by § 11 of the Act, 29 U.S. C.A. § 260. The congressional purpose in including § 11, as we read it, was to safeguard an employer acting in good faith. Ferrer v. Waterman S. S. Corporation, D.C. Puerto Rico, 1949, 84 F. Supp. 680.

 The firemen urge that General Electric cannot have acted in good faith when it made no attempt to obtain a ruling by the Administrator of the Wage and Hour Division in advance of the inauguration of the two-platoon system. Extreme caution perhaps would have dictated an inquiry of the Administrator as to the status of the employees, but good faith is not solely predicated upon action pursuant to an express administrative ruling. Landaas v. Canister Co., 3 Cir., 1951, 188 F.2d 768. Reliance on a ruling by the Administrator would be a complete defense to any liability for

overtime compensation under § 10 of the Act.[6] The requisite good faith was met when there were substantial unsettled issues of law and General Electric acted in reliance upon reasonable advice of counsel. Landaas v. Canister Co., 3 Cir., 1951, 188 F.2d 768; Ferrer v. Waterman S.S. Corporation, D.C. Puerto Rico, 1949, 84 F.Supp. 680.

There is nothing in the record to support the contention that the trial court overlooked the testimony with regard to a placard posted on the company bulletin board. This placard printed by the Wage and Hour Division of the Department of Labor and posted on the bulletin board by a ministerial employee of General Electric notified all employees that Hanford Works was engaged in a government contract covered by the Walsh-Healey Act, 41 U.S.C.A. § 35 et seq. and the Fair Labor Standards Act. The trial court considered this evidence and did not think it controlling.

Judgment affirmed except as to the disallowance of the sleeping time as work time. The case is remanded to the trial court to correct the judgment in accordance with the views herein expressed.

6. 29 U.S.C.A. § 259:

"§ 259. Reliance in future on administrative rulings, etc.

"(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he

belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

"(b) The agency referred to in subsection (a) of this section shall be—

"(1) in the case of the Fair Labor Standards Act of 1938, as amended— the Administrator of the Wage and Hour Division of the Department of Labor;

"(2) in the case of the Walsh-Healey Act—the Secretary of Labor, or any Federal officer utilized by him in the administration of such Act; and

"(3) in the case of the Bacon-Davis Act—the Secretary of Labor. May 14, 1947, c. 52, § 10, 61 Stat. 89."