David M. KELLY; Ross M. Campbell and Jerome A. Gunsalus, Plaintiffs,

v.

O. Stephen BALLARD, individually and dba Bay Cities Ambulance; Miller's Ambulance Service of San Diego, Inc. and Bay Cities Ambulance Service, Inc., Defendants.

Civ. No. 67–39–S.

United States District Court
S. D. California.

April 24, 1969.

Anthony W. Bright, Escondido, Cal., for plaintiffs.

Donald J. Helmer, Sheela, Lightner, Hughes, Hilmen & Castro, San Diego, Cal., for defendants.

### MEMORANDUM OF DECISION

SCHWARTZ, District Judge.

This is an action to recover unpaid minimum and overtime wages as provided in the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. Jurisdiction is conferred by 28 U.S.C. § 1337 and 29 U.S.C. § 216(b). The parties have stipulated as to the material facts, and have submitted the case upon oral argument and briefs as to the questions of law involved. Thus, in effect, the case is now before the court for summary judgment.

The parties by written stipulation agreed upon the material facts as follows:

"This is an action by plaintiffs, DAVID M. KELLY, ROSS M. CAMPBELL and JEROME A. GUNSALUS, for wages allegedly due them by BAY CITIES AMBULANCE SERVICE, INC. (hereinafter called BAY CITIES), a successor in interest of MILLER'S AMBULANCE SERVICE OF SAN DIEGO, INC., under the provisions of the Fair Labor Standards Act of 1938. MILLER'S AMBULANCE SERVICE OF SAN DIEGO was purchased by defendant, O. STEPHEN BALLARD, on or about August 19, 1965 and renamed BAY CITIES. BAY CITIES operates eight ambulance station locations in San Diego County where two or more drivers or ambulance attendants are employed on a twenty-four hour basis for the purpose of answering ambulance calls. There are one or more ambulances located in each of these stations and each station is fully manned seven days per week.

"All three plaintiffs were employed by BAY CITIES as ambulance drivers or attendants to work in the various stations and respond to calls for defendant's ambulances. Their duties in general were to take any ambulance calls that might come to their station during their time of duty, and also to maintain the cleanliness of their station, their ambulance and themselves.

"During the period of time that plaintiffs were on duty, they were required to be available and ready to answer a call for the ambulance twenty-four hours per day. They had no fixed eating or sleeping schedules and might not be required to answer a call for a twenty-four hour period or might be away from the station answering calls for more than twenty-four hours.

"Prior to defendant Ballard's purchase of MILLER'S AMBULANCE SERVICE OF SAN DIEGO, INC., on or about August 19, 1965, plaintiffs were on duty twenty-four hours per day, five days per week, for a total of 120 hours per week. After defendant Ballard's purchase of MILLER'S AMBULANCE SERVICE OF SAN DIEGO, INC., plaintiffs were on duty twenty-four hours a day, five and one-half days per week for a total of 132 hours per week. This work schedule continued until May 15, 1965.

"The stations generally utilize a dwelling where sleeping and kitchen facilities were available to plaintiffs. Plaintiffs were required to be in the station or in the ambulance remaining in radio con-

tact with defendant's headquarters at all times while on duty and would use the ambulance for necessary personal trips such as purchasing groceries and haircuts. Plaintiffs were required to furnish their own uniforms and cleaning and to make their own arrangements for relief personnel on their days off.

"Plaintiffs did not reside upon the station premises on a permanent basis and during the times that plaintiffs were on duty, they were not allowed to engage in normal private pursuits nor to leave the premises for purposes of their own. Plaintiffs' periods for eating, sleeping, purchasing of their supplies or normal daily functions were subject to the answering of emergency calls as they came in.

"Calls for ambulance service come to defendant's ambulance stations either by telephone or by radio from private citizens, doctors, the California Highway Patrol, local police departments, the Sheriff's Department or other governmental or federal agencies.

"Defendant's ambulances transport sick and injured persons, who are, but not limited to, citizens of the United States and citizens of foreign countries, United States Military Personnel, Veterans patients, and dependents of government employees.

"In the operation of defendant's ambulance service, patients are transported from and over State and Local Highways, connecting interstate and U. S. Highways, commercial airports and aircraft, to and from the Republic of Mexico, to and from local, State, Federal and Military hospitals, and from other and various locations throughout San Diego County utilizing local, State, and Interstate Highways.

"The records of BAY CITIES, indicates that during plaintiff Kelly's period of employment he serviced a total of approximately 235 calls. Of this amount, 24 or 9% of the total calls made by plaintiff Kelly were calls involving accidents on Interstate Highways.

"Plaintiff Gunsalus was involved in 641 trips during his employment with BAY CITIES and 5 trips or 1% of plaintiff Gunsalus' activity were made to accidents on interstate highways. In addition, plaintiff Gunsalus made five trips to the Republic of Mexico.

"Plaintiff Campbell made approximately 280 trips for BAY CITIES during his period of employment and 24, or 8% involved accidents on Interstate Highways.

"BAY CITIES services are available to the general public and almost 100% of its business is conducted within the State of California. Seventy-five (75%) percent or more of BAY CITIES income is paid for by the individual receiving the service as opposed to governmental agencies."

The questions of law to be decided are: (1) whether the plaintiffs were "engaged in commerce" within the meaning of the Act, §§ 206 and 207 of Title 29 U.S.C., and, if so, whether defendant is exempt under the provisions of § 213(a) (2); (2) whether, if the Act applies to the activities of the plaintiffs, any compensation due should include payment for mealtimes and sleep time on a twenty-four hour basis; and (3) whether liquidated damages should be granted to plaintiffs pursuant to 29 U.S.C. § 216(b).

■ There is no pat formula by which to ascertain whether sections 206 and 207 of the Act apply to employees' activities. It is well established that the scope of the Act is not coextensive with the limits of the power of Congress over commerce. Mitchell v. Lublin, McGaughy & Assoc., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). In the final analysis, each case must stand or fall on its own particular facts. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1941). The activities of the employees, and not the business of the employer, are to be considered under the pre-1966 provisions of the Act applicable here. Mitchell v. Lublin, McGaughy & Assoc., *supra.* The Court in the *Lublin, McGaughy & Assoc.* case enunciated a

practical test to determine whether employees are "engaged in commerce":

"The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than an isolated, local activity." 358 U.S. at 212, 79 S.Ct. at 264.

The Ninth Circuit, in Mateo v. Auto Rental Company, 240 F.2d 831 (9th Cir. 1957), restated the test and elaborated some specific factors to be examined:

"The issue here presented is a factual one. Its determination must be guided by practical considerations, not technical conceptions. * * * The ultimate test is whether the local transportation service is an "integral step in the interstate movement." * * * Economic factors and common understanding are important considerations to be weighed in resolving this question. Such factors as the nature and extent of the work claimed to be part of interstate commerce, the structure and operations of the company, the competitive status of the firm, the relationship with those clearly engaged in interstate transportation, and the geographical location of the local termini are all relevant. The decision must rest on the particular facts of each case." 240 F.2d at page 833.

There is very little direct authority on the applicability of the Act to ambulance drivers. However, the Western District of Michigan has recently issued a well-reasoned decision in a case quite similar to the instant case, Duffy v. Oele, 274 F.Supp. 307 (W.D.Mich.1967), holding that the Act applies to ambulance drivers. In Duffy, as well as here, the plaintiffs were employed to answer emergency calls to pick up dead and injured accident victims on public streets and highways. The court in Duffy not only cited analogous precedent involving other kinds of highway maintenance employment wherein the Act was applied (see cases cited therein), but relied especially upon the rulings of the Wage and Hour Administrator which are normally given substantial weight. In particular, Duffy quoted Opinion Letter No. 424, January 12, 1966, C.C.H. Labor Law Reporter, Wages-Hours, Administrative Rulings, Paragraph 30, 996.55, in part as follows:

"Ambulance drivers and attendants making intrastate trips to pick up dead or injured victims of motor vehicle accidents on public streets and highways are engaged in interstate commerce within the meaning of the Act. Public policy and police practice require that such persons must be attended to before the stopped and disabled vehicles can be moved in order to clear the highway so that the normal flow of traffic can be resumed. Consequently, the ambulance service is so closely related to the movement of commerce and the functioning of its instrumentalities as to be part of commerce." 274 F.Supp. at 311.

A conflicting case has come out of a Washington State Superior Court, Klemp v. Rainbow Ambulance Service, Inc., Case No. 669570 (decided Nov. 9, 1967). In a factual situation similar to the instant case, the court held that the Act does not cover ambulance drivers. In Klemp, 7% of a total of 3,777 calls answered by defendant were at intersections within Seattle, 1% at airports, and 1% at docks and ships; not all intersection calls involved interstate highways, however. Only on one occasion did an ambulance cross a state line. In such factual context, the court found "[t]hat the substantial part of the defendant's business and operation is local in character and is not interstate in nature" [Par. II et seq., pg. 3, Findings of Fact and Conclusions of Law, attached to defendant's memorandum filed on February 7, 1969]. In the Klemp court's memorandum decision, which is supplied to the court by defendant here, the Washington State Superior Court purported to rely on the reasoning of Mateo v. Auto Rental Company, 240 F.2d 831, a 1957 Ninth Circuit case, in reaching its decision [See Memorandum Decision, pg. 4 et seq.].

In *Mateo, supra,* the Ninth Circuit held that plaintiffs employed as drivers for an "airporter" service were not covered by the Act. The "airporter" service was a company which provided transportation services for those traveling to and from the international airport at Honolulu. The company used 11-passenger limousines to transport anyone who paid the fare, but 50% of the customers were those who pre-reserved such service, which could be done through the airlines or travel offices. Some airlines contracted for transportation of crew members. The only passenger agreements which were made with airlines, however, were not recognized as valid by the Hawaii Aeronautics Commission. The *Mateo* court relied on the lack of comprehensive contracts with the airline, on the fact that the limousines were not used exclusively for airporter services, and on the fact that even local residents could ride in the limousines.

Although there is a close question of case analysis involved here, it is submitted that the better view is expressed in Duffy v. Oele, *supra,* rather than in *Klemp, supra.* Furthermore, *Mateo* is not inconsistent with *Duffy* inasmuch as the factual distinctions, between the airporter limousine service in the former case and ambulance drivers here, are quite significant.

In the *Duffy* and *Klemp* factual situations, the very flow of interstate travel itself is affected, where as in the *Mateo* situation, the plaintiffs' work was conceptualized as affecting only local travel. The court in *Mateo,* at p. 835, treated the airporter service as purely local:

"When a person arrives at International Airport; steps into the Honolulu sunshine; touches his feet to terra firma; receives a friendly aloha greeting * * * and is free to select from a multitude of choices a means transportation to his local destination, he has, 'in the commonly accepted sense of the transportation concept,' arrived in Hawaii. Those who thereafter fur-nish him transportation are engaged in activity of a purely local nature."

It seems that ambulance drivers who, as in this case and as in *Duffy* and *Klemp,* intercept injured passengers during the process of interstate travel, have a much closer association theoretically with the flow of interstate commerce than the drivers in *Mateo.* A purely analogous situation to that in *Mateo* would be an ambulance service which picks up passengers injured only when reaching the final destinations of their interstate travel.

Thus, *Klemp's* reliance on *Mateo* seems misplaced.

Strengthening the view that *Duffy* represents the better position are cases holding the Act applicable to employees in roadway repair and towing operations. In Crook v. Bryant, 265 F.2d 541 (4th Cir. 1959), the court held that the Act covered a part-time night watchman and janitor whose duties included taking occasional calls relating to his employer's towing service. The *Klemp* court rejected the *Crook* case [pg. 4, Memo Decision] without discussing it on the merits. Moreover, there are several cases holding the Act applicable to employees who haul materials used in the repair of highways, Wirtz v. Crystal Lake Crushed Stone Company, 327 F.2d 455 (7th Cir. 1964) (covered are employees of gravel pit owner selling gravel to county highway commission for repair purposes and employees of trucking companies hauling repair materials); Goldberg v. Morris, 205 F.Supp. 302 (E.D.Ky.1962) (held materials hauler was engaged in the production of goods); Walling v. Staffen, 5 F.R.D. 236 (W.D.N.Y.1946) (handling slag and similar materials used to repair instrumentalities of commerce termed as engaged in production of goods). Cases cited in *Duffy* provide further support.

The defendant here vigorously urges that, even if the activities of plaintiffs would ordinarily be covered by the Act, nevertheless he is exempted under § 213 (a) (2) because defendant's business is

a "retail or service establishment". This argument is not well taken.

Once again, the court in *Duffy*, the only direct authority, provides an answer contrary to the position of defendant. In holding that ambulance businesses are not retail or service establishments within the meaning of § 213, *Duffy* cited Opinion Letter 447 of the Wage and Hour Administrator which declared that the typical ambulance service was part of the transportation industry in which there is no traditional concept of retailing within the meaning of § 213(a) (2).

The reasoning in *Duffy* on this point appears sound. The exemptions to the Fair Labor Standards Act are to be narrowly construed. Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959). The traditional concept of local retailing is to be used in determining whether the exemption applies. In Coast Van Lines v. Armstrong, 167 F.2d 705 (9th Cir. 1948), the court declared "that Congress did not intend to exempt employees of all sellers of services, but only of those establishments whose business was analogous to the local retailer. In short, the word 'service' means in effect 'retail service'." 167 F.2d at 706. In Mitchell v. Kentucky Finance Co., *supra*, the court held that the small loan company was not a retail service regardless of the class of persons from which its customers came. Although the Act's provisions prior to the 1966 amendment are to be applied in this case, as in *Duffy*, it seems significant that in 1966 § 213(a) (2) was amended to exclude from its provisions those employees who were engaged in the operation of a hospital.

In addition, defendant also argues that the activities of the plaintiffs should be held not covered by the Act because their contacts with interstate commerce were of a *de minimus* character. This court is not prepared to so hold. Although the actual number of contacts were small compared to the whole, those contacts were significant in maintaining the uninterrupted flow of interstate commerce. In this regard, it should be noted that in *Klemp, supra,* the court made no specific findings as to the exact number of direct contacts plaintiffs there had with accidents on interstate thoroughfares specifically, but only as to contacts with intersections within the City of Seattle. In addition, the court in *Klemp* found "[t]hat not all intersection calls were on interstate freeways or arterials leading to or from the freeways, nor were all of them on rights of way * * * [and] * * * [t]hat on only one occasion did an ambulance cross a state line." Findings of Fact and Conclusions of Law, pg. 2, Par. IV and V. Even more important, so far as any *de minimus* argument is concerned, is the nature of plaintiffs' duties: plaintiffs were, while on duty, at all times available to answer any call whatsoever for services on an interstate freeway.

For the reasons stated above, in particular following the *Duffy* case, it is concluded that the plaintiffs' activities are covered by the Fair Labor Standards Act, §§ 206 and 207 of Title 29 U.S.C., and that defendant is not exempted under § 213(a) (2).

The next question to be considered is whether plaintiffs are to be compensated for mealtimes and sleep time. The defendants argue that an eight-hour sleep time period and a three-hour mealtime period should be subtracted from each twenty-four hour on-duty period for sleep time and mealtime respectively.

As with the question of the basic coverage of the Act itself, the compensability of mealtime and sleep time depends upon the particular facts of each case. Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944). In *Armour*, the court held that readiness to serve may be hired. The court declared:

"Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." 323 U.S. at 133, 65 S.Ct. at 168.

The court elaborated upon these principles in Skidmore v. Swift & Co., 323 U.S.

134 (1944), at pages 136–137, 65 S.Ct. 161 at page 163, 89 L.Ed. 124:

"[W]e hold that no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time. * * * Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. * * * This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was."

General Electric Co. v. Porter, 9 Cir., 208 F.2d 805 (9th Cir., 1953), cert. den. 347 U.S. 951, 975, 74 S.Ct. 676, 98 L.Ed. 1097 (1954), applied the above principles where privately employed community firemen sought compensation for sleeping time. In holding that the sleeping time should be compensated, the court placed particular emphasis on the absence of an express or implied agreement and on the fact that the firemen, who were on duty and subject to calls all during the sleeping times, did not reside permanently at the fire station. The importance of such factors was reaffirmed in Rural Fire Protection Company v. Hepp, 366 F.2d 355 (9th Cir. 1966).

In the instant case, as in General Electric Co. v. Porter, *supra*, it must be inferred that no agreement existed concerning the compensability of the periods in question. Here, the defendant appar-

ently paid the monthly wage without any distinctions made as to the mealtimes and sleeping time; certainly neither party has, in all the pleadings and arguments, ever asserted the existence of an implied or express agreement. In *General Electric Co.*, the court concluded where payment was made without indicating that it was for only sixteen hours that such indicated a belief by the employer that the wages were for a full twenty-four hour shift.

Also in the instant case, the parties have stipulated that the plaintiffs did not reside permanently at the ambulance stations, even though eating and sleeping facilities existed for on-duty needs [Parties' Agreed Statement of Facts, pg. 2].

Thus, considering the nature of the plaintiffs' duties, it must be concluded that they were engaged to wait and that their compensation included the waiting time on a twenty-four hour basis as well as the tasks which they were called upon to perform. Here, as stipulated by the parties, the plaintiffs were required to remain on call at the station or near the ambulance on a twenty-four basis while on duty. Their use of the eating and sleeping facilities was primarily for the benefit of their employer. As stated in *General Electric Co., supra,* "[t]he sleep allowed was a fitful one at best, which might be said to have been with one eye open in anticipation of the moment they would be called upon to jump to the response of an alarm." 208 F.2d at 815.

█ It is the holding of this court, therefore, that the compensation due under §§ 206 and 207 of Title 29 U.S.C., should be calculated without substracting mealtimes and sleeping time while on duty. For the purposes of this holding, no distinction is made between mealtimes and sleeping times because, in the circumstances of this case, the time periods in question were equally for the benefit of defendant and equally subject to interruption by emergency calls.

The final question to be considered is whether liquidated damages under 29 U.S.C. § 216(b) would be appropriate.

Under the provisions of 29 U.S.C. § 260, the court in its discretion may refuse to award liquidated damages in an action to recover unpaid minimum and overtime compensation where the employer shows that he acted in good faith and with reasonable grounds for believing that the Act did not apply to his employees. Good faith is indicated where the law is uncertain. General Electric Co. v. Porter, *supra;* Wyatt v. Holtville Alfalfa Mills, 106 F.Supp. '624 (S.D.Cal.1952) mod. on other grounds, 230 F.2d 398 (9th Cir. 1955). In view of the substantial nature of the legal questions regarding applicability of the Act which existed at the time the events concerned took place, it is the conclusion of this court that liquidated damages are not merited in this case because noncompliance was reasonable and in good faith.

Therefore, the plaintiffs are entitled only to compensation under §§ 206 and 207 in addition to the awarding of costs and attorney's fees under § 216.

Plaintiff DAVID M. KELLY shall recover unpaid minimum and overtime wages assuming working hours of 120 hours per week for seven weeks from July 1, 1965 to August 18, 1965, and of 132 hours per week for 38½ weeks from August 19, 1965 to May 15, 1966. These were the on-duty hours stipulated by the parties on February 7, 1969. At the statutory rate of $1.25 for the first forty hours and $1.875 for the hours each week in excess of forty, the sum due plaintiff Kelly under §§ 206 and 207 is $7,698.25.

Plaintiff ROSS M. CAMPBELL worked 14 weeks at 120 hours on-duty per week between May 15, 1965, to August 18, 1965, and worked 38½ weeks at 132 hours on-duty per week from August 19, 1965, to May 15, 1966. These are hours and time periods as stipulated by the parties on February 7, 1969. At the statutory rates aforementioned, the amount owed to Campbell under §§ 206 and 207 is $8,474.09.

Plaintiff JEROME A. GUNSALUS was on duty 120 hours per week for 8⅓ weeks from February 23, 1965, to April 23, 1965, and was on duty 132 hours per week for 27 weeks from November 1, 1965, to May 7, 1966. Again, said on-duty hours and time periods were stipulated by the parties on February 7, 1969. At the statutory rates, the amount owed to Gunsalus pursuant to §§ 206 and 207 would be $6,050.00.

Costs as prayed for under § 216 shall be allowed in the amount of $67.62, and attorneys' fees shall be allowed to each plaintiff in the following amounts:

1. David M. Kelly: $700.00;
2. Ross M. Campbell: $800.00;
3. Jerome A. Gunsalus: $600.00.

Separate judgment shall be filed herewith. This memorandum of decision shall be findings of fact and conclusions of law pursuant to Fed.R.Civ.P., Rule 52.