DEHOOG, P. J.
*650 This is the second appeal in a dispute over firefighters' entitlement to overtime pay under ORS 652.060 to 652.080. In the prior appeal, we affirmed a declaratory ruling by the Bureau of Labor and Industries (BOLI), which held that the City of Grants Pass (defendant or the city) was required, despite a union contract to the contrary, to comply with ORS 652.080's requirement that "authorized vacation or sick leave time shall be considered as time on regular duty" when calculating firefighters' entitlement to overtime pay. IAFF, Local 3564 v. City of Grants Pass , 262 Or. App. 657, 326 P.3d 1214 (2014). Following our decision, the city provided BOLI with an accounting of what the city described as its "maximum possible obligation due" to its firefighters for overtime hours worked between 2010 and 2014. BOLI rejected that accounting, disputing the city's interpretation of ORS 652.060 and ORS 652.070 and its resulting calculation of its firefighters' average work hours. On behalf of those firefighters, BOLI initiated an enforcement action in circuit court, seeking *629 payment of overtime wages, penalty wages for the city's failure to pay overtime, and a declaration regarding the proper method of calculating how much overtime was due any firefighter owed overtime. Following a stipulated facts trial, however, the trial court concluded that ORS 652.060 and ORS 652.070 did not entitle any of the city's firefighters to additional overtime pay; accordingly, the court dismissed BOLI's complaint in its entirety, without reaching BOLI's contention regarding the proper means of calculating any overtime that may be due.[1]
BOLI appeals, arguing that the trial court erroneously construed those statutes and that, even if the court's construction is correct, the city is nonetheless obligated to pay at least some of its firefighters overtime and we should determine how that obligation is to be calculated. For the reasons that follow, we conclude that the trial court's understanding of ORS 652.060 and ORS 652.070 was not *651 erroneous. We further conclude that the trial court implicitly found that the city had not required any of its firefighters to work hours that would qualify them for overtime under a correct interpretation of those laws, and BOLI does not challenge that factual finding on appeal.[2] As a result, we, like the trial court, do not address BOLI's argument regarding the proper means of calculating any overtime that may come due, and, accordingly, affirm.
Before addressing the parties' arguments, we provide a brief overview of the statutes at issue, which govern workweek limitations and overtime requirements for full-time firefighters. As the parties acknowledge, those statutes-like firefighter scheduling practices in general-depart significantly from the workweek and overtime requirements common to many other occupations. First, while many workers are entitled to overtime pay if they work more than 40 hours a week, ORS 652.060(1) establishes a regular-duty workweek of 72 hours for fire departments that employ three or fewer full-time firefighters and a 56-hour workweek for fire departments with four or more full-time firefighters.[3] Second, despite those seemingly *652 absolute thresholds to overtime pay, ORS 652.060(1) provides fire departments with a "safe harbor," under which an employer is "deemed to have complied with [ ORS 652.060(1) ] and ORS 652.070 if the hours of regular duty required of firefighters employed by it average not more than [72 or 56] hours a week *630 over each quarter of the fiscal year." (Emphasis added.)
In turn, ORS 652.070(1) requires employers to "put into effect and maintain a schedule of working hours" that complies with ORS 652.060.[4] If an employer fails to do so, it must pay overtime "to every regularly employed firefighter as additional pay for every hour of regular duty required of and performed by the firefighter over and above the average hours established by ORS 652.060." Finally, ORS 652.080, the statute at issue in our earlier decision, IAFF, Local 3564 , 262 Or. App. at 659, 326 P.3d 1214, provides for the treatment of authorized vacation or sick leave time as time spent on regular duty.[5]
*653 The present dispute centers on the meaning of ORS 652.060(1)(b)'s safe harbor provision, which applies to defendant as a city employer with four or more full-time firefighters. As noted, the safe harbor provision provides that "any affected [employer] shall be deemed to have complied with this paragraph and ORS 652.070 if the hours of regular duty required of firefighters employed by it average not more than 56 hours a week over each quarter of the fiscal year of the [employer]." At a stipulated facts trial on BOLI's complaint, the city argued that, because the legislature had used the plural term "firefighters" in the safe harbor provision, it must have intended average hours to be calculated collectively across all of a department's firefighters, rather than on an individual basis for each firefighter.[6] That is, an employer would not be required to pay overtime for a particular quarter if, on average, its firefighters were not required to work more than 56 hours per week, even if one or more individual firefighters were required to work an average of more than 56 hours per week over that period. BOLI, on the other hand, argued that the safe harbor provision operates at the level of individual firefighters employed by a department, such that any firefighter required to work an average of more than 56 hours per week over the course of a quarter would qualify for overtime pay. According to BOLI, the legislature could not reasonably have intended for a firefighter whose average workweek exceeded 56 hours to be ineligible for overtime merely because his or her coworkers averaged shorter workweeks.
Ultimately, the trial court adopted the city's interpretation, concluding that, under ORS 652.060(1)(b), the phrase "firefighters employed by it" refers to all of a department's firefighters as a whole, and not to individual firefighters within the department. Because the trial court *654 apparently understood the evidence to show that the city had *631 not required its firefighters, collectively, to work an average of more than 56 hours per week in any quarter, the court dismissed with prejudice BOLI's first and second claims for relief (seeking payment of overtime and penalty wages) and concluded that BOLI was "not entitled to the declaration sought" in its third claim for relief.[7] BOLI now appeals those rulings, and both parties reprise the arguments that they made at trial.
Where, as here, the resolution of a dispute depends upon the meaning of a statute, our "paramount goal" is to determine what the legislature intended the statute to mean. State v. Gaines , 346 Or. 160, 171, 206 P.3d 1042 (2009). In conducting that inquiry, we start by examining the best evidence of legislative intent-the text and context of the statute itself, id. -and apply "rules of construction of the statutory text that bear directly on how to read the text." PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993). Furthermore, to the extent that it may be helpful, we will consider any available legislative history, and, if the intended meaning of a statute remains unclear, we may resort to "general maxims of statutory construction." Gaines , 346 Or. at 172, 206 P.3d 1042.
Beginning with the text of the safe harbor provision, BOLI argues that the legislature's use there of the plural term "firefighters" is likely a simple reflection of "the unremarkable reality that [typically] more than one firefighter works in a fire department, and thus refers to the individual average hours of [each of] those multiple firefighters," rather than a cumulative average across all firefighters within a department. BOLI acknowledges that no rule of grammar would compel either its or the city's reading of "firefighters." Nor would any statutory rule of construction. In fact, one seemingly applicable such rule, ORS 174.127(1), further obscures the legislature's objective in choosing the plural form by instructing us that, generally *655 speaking, the statutory use of "[t]he singular number may include the plural and the plural number, the singular."[8]
BOLI argues, however, that the context of the safe harbor provision resolves that uncertainty and compels us to read the term "firefighters" in that provision as referring to individual firefighters. BOLI emphasizes that the text surrounding the safe harbor focuses on individual workers. For example, the basic workweek limitation in ORS 652.060(1) provides that "[n]o person employed on a full-time basis as a firefighter * * * shall be required to be on regular duty * * * more than [56 or 72] hours a week." (Emphasis added.) Similarly, the remedial provision in ORS 652.070(1) requires employers to pay overtime wages to "every regularly employed firefighter " for excess hours "required of and performed by the firefighter ." (Emphases added.) Moreover, the legislature's general policy governing wage and hour provisions similarly focuses on individuals:
"It is the public policy of this state that no person shall be hired, nor permitted to work for wages, under any conditions or terms, for longer hours or days of service than is consistent with the person's health and physical well-being and ability to promote the general welfare by the person's increasing usefulness as a healthy and intelligent citizen."
ORS 652.010(1) (emphases added). BOLI further observes that, consistently with that legislative focus on individual workers, the legislature appears to have used "firefighters" to mean "one or more individual firefighters" in another related statute, ORS 652.050(2), which defines "[r]egularly organized fire department" as an organization that "employ[s] one or more persons on a full-time basis as firefighters."
*632 Relying on essentially the same context, however, the city contends that "firefighters" as used in ORS 652.060(1) must mean firefighters collectively, such that a city's work schedule will fit within the safe harbor provision so long as the combined hours of all of the firefighters it employs average no more than 56 hours per week over the course of a fiscal quarter. The city argues that, because the legislature *656 separately used the terms "firefighter" and "firefighters," we should assume that the legislature intended for those terms to have different meanings. See, e.g. , VanWormer v. Farmers Ins. Co. , 171 Or. App. 450, 455, 15 P.3d 612 (2000) (noting the "legislature's conscious shift from the singular to plural" in the use of "limit" and "limits" in the underinsured motorist statute). Contrary to BOLI's suggestion, the city contends that ORS 174.127(1) has no bearing here, because the legislature has purposely chosen to use both the singular and plural forms of the word "firefighter," thus they cannot be viewed as interchangeable. The city observes that the provisions setting out what an employer must do to avoid paying overtime all appear to address firefighters collectively: ORS 652.060(1), for example, provides that an employer "shall be deemed to have complied" with ORS 652.060 and ORS 652.070 based on "the hours of regular duty required of firefighters employed by it," and ORS 652.070(1) requires employers to "put into effect and maintain a schedule of working hours required of regularly employed firefighters " that complies with ORS 652.060 and ORS 652.070. (Emphases added.)
In advocating that we should understand the use of "firefighters" in the safe harbor provision to mean firefighters collectively, the city emphasizes the manner in which that provision comes into play. As the city sees it, although ORS 652.060(1)(b) states that "[n]o person * * * shall be required to be on regular duty with such fire department more than 56 hours a week," the availability of the safe harbor contemplates a city implementing ("put[ting] into effect") and "maintain[ing]" a department-wide schedule: "[A] schedule of working hours required of regularly employed firefighters." See ORS 652.070(1). The city acknowledges that an employer is disqualified from protection under the safe harbor "if the hours of regular duty required of firefighters employed by it average * * * more than 56 hours a week" over a fiscal quarter, see ORS 652.060(1) (emphasis added); the city argues, however, that BOLI's construction would improperly insert the phrase "of a firefighter employed by it" for the emphasized statutory language above, something no court may do. See ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is ***
*657 contained therein, not to insert what has been omitted, or to omit what has been inserted[.]").
Thus, the city contends, the trial court correctly construed ORS 652.060 and ORS 652.070. The city further argues that, under that correct interpretation, it satisfied the safe harbor's requirements because it scheduled its firefighters to work an average of no more than 56 hours per week over each quarter and kept to that schedule. Finally, the city asserts, because the trial court evidently rejected BOLI's argument that the stipulated evidence showed otherwise, the court was correct to dismiss BOLI's complaint in its entirety.
Given the text and statutory context of ORS 652.060 and ORS 652.070, each of the parties' proposed constructions of the safe harbor provision-and, in particular, each parties' view regarding the significance of the term "firefighters" in that provision-is plausible; accordingly, neither provides a conclusive answer as to how the legislature intended the safe harbor provision to apply. However, as we will explain, the practical context in which ORS 652.060 and ORS 652.070 were enacted provides additional guidance and supports the interpretation of those statutes that the city advances.
As noted above, firefighters' schedules are far from typical when compared to those of other workers. And, although there is relatively little in the legislative record that directly reflects that the legislature that enacted ORS 652.060 and ORS 652.070 understood the idiosyncrasies of fire department scheduling, it is reasonable to assume that the legislature is generally familiar with the subject matter on which it legislates. Cf.
*633 Peters et al. v. McKay et al. , 195 Or. 412, 439-40, 238 P.2d 225 (1951), reh'g den. , 195 Or. 412, 246 P.2d 585 (1952) ("When, in the process of statutory construction, the legislative intent is not manifest, courts may properly seek the intent by considering the subject matter, the necessity for the law, the circumstances under which it was enacted, the mischief sought to be remedied and the objective to be attained."). Moreover, as the city and amici curiae observe, the legislature's enactment of a safe harbor provision strongly suggests that the legislature was aware *658 of the week-by-week variation in work hours characteristic of fire departments and sought to account for that practice by averaging firefighters' hours over the course of the fiscal quarter.
What little legislative history we have further supports the city's understanding of the safe harbor provision, because it reflects practices consistent with those of the city and other municipal fire departments. For example, a witness testifying in connection with amendments made to the statute in 1969 explained that the bill's authors "had arrived at the 56-hour week * * * because the underwriters prefer [fire departments] to keep their crews together for the most efficient firefighting." See Minutes, Senate Committee on Labor and Industries, SB 383, Mar 10, 1969, at 2 (statement of Glen Whallon, Oregon State Fire Fighters Council). And, indeed, the same witness testified that "[t]he majority of the departments in the State are already under the 56-hour work week." Id . at 1. We also consider it likely that, both in 1969 and during earlier sessions, the legislature would have understood that the firefighters comprising those crews were routinely on duty in 24-hour shifts,[9] either on individual days separated by time off or in 48-hour blocks, as the city schedules its firefighters. As indicated both by materials in the record and additional resources cited on appeal without objection by respondent and amici , fire departments typically implement "56-hour workweeks" by maintaining three crews, with each crew working a repeating schedule of either one day on, two days off ("24/48") or two days on, four days off ("48/96").[10] An elementary analysis reveals that the inevitable consequence of either arrangement is that each *659 crew will work either 48 or 72 hours in a given week, but never exactly 56 hours. Rather, the three crews will collectively average 56 hours every week, while each individual crew will average 56 hours per week only over the course of at least three weeks for a 24/48 schedule, or six weeks for a department employing a 48/96 schedule, as the following diagram illustrates (for a department scheduling on a 24/48 basis): *634 Week 1 (24/48 schedule)
Crew Sun. Mon. Tues. Wed. Thur. Fri. Sat. Total A 24 24 24 72 B 24 24 48 C 24 24 48 Avg. 56
Week 2 (24/48 schedule)
Crew Sun. Mon. Tues. Wed. Thur. Fri. Sat. Total A 24 24 48 B 24 24 24 72 C 24 24 48 Avg. 56
Week 3 (24/48 schedule)
Crew Sun. Mon. Tues. Wed. Thur. Fri. Sat. Total A 24 24 48 B 24 24 48 C 24 24 24 72 Avg. 56
Although the specific numbers necessarily vary, the same idea holds true for the 72-hour workweek that ORS 652.060(1)(a) authorizes for small departments-those employing no more than three fulltime firefighters.[11] That is, as typically implemented, a 72-hour workweek schedule *660 also reflects an irregular shift rotation but, over time, each shift will average the same number of hours per week. See General Electric Co. v. Porter , 208 F.2d 805, 811-12 (9th Cir. 1953), cert. den. , 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954) (describing the "two-platoon system," where "firemen are on duty for a 24 hour shift, off 24 hours, with each sixth shift off," and explaining that, under such a schedule, "[i]n 1/4 of the weeks [the firefighters] were required to be at the fire station 48 hours, in 1/2 of the weeks 72 hours, and in 1/4 of the weeks 96 hours"). Other scheduling variations also exist, and the available historical and legislative materials suggest that the legislature would have been generally familiar with the scheduling challenges that fire departments face and the ways in which they are often addressed. In particular, the legislature would have understood the need to schedule crews in multiple shifts that do not neatly align with the seven-day calendar week.[12] *635 With that legislative context in mind, we return to the text of the safe harbor provision in ORS 652.060(1)(a) and (b) :
"However, any affected incorporated city, municipality or fire district shall be deemed to have complied with this paragraph and ORS 652.070 if the hours of regular duty required of firefighters employed by it average not more than [56 or 72] hours a week over each quarter of the fiscal year of the employing city, municipality or fire district."
That provision accommodates the inevitable irregularity of firefighters' schedules, which, as the above diagram illustrates, periodically exceed the presumptive weekly limits but equate to a 56- or 72-hour workweek when averaged across *661 several weeks.[13] The legislative decision to enact workweek limits-and a corresponding safe harbor provision-that reflected typical fire department scheduling practices is best understood as endorsing those practices. Thus, to deny an employer like the city, which purports to adhere to such scheduling practices, the benefit of a safe harbor evidently designed to accommodate them, would defeat the apparent purpose of that provision. We are reluctant to construe a statute to that effect on the mere suspicion that such a provision could be subject to abuse.[14]
Ultimately, in light of the purpose of the safe harbor provision and the context in which it was enacted, we conclude that the city has the better reading of the statute. Under ORS 652.060 and ORS 652.070, a city is not required to pay its firefighters overtime so long as those firefighters, collectively, are not required to work an average of more than 56-or 72-hours per week over the course of a quarter of the city's fiscal year. It follows that the trial court did not err in adopting the city's interpretation of those statutes.
Further, we cannot reconcile BOLI's request that we determine the proper method of calculating overtime that may come due with the underlying decision of the trial court. In a letter opinion, the court expressly found for the city and against BOLI as to each of BOLI's three claims, and, in its judgment, the court stated that BOLI was not entitled to the declaration it sought. We understand the court, in making those rulings, to have implicitly rejected the factual premise of BOLI's final argument on appeal, i.e. , that the parties'
*662 stipulations showed that, for at least one quarter, the city scheduled its firefighters to work an average of more than 56 hours per week, such that some overtime was due even under the city's interpretation. And, as noted, BOLI does not challenge that factual finding on appeal. As a result, we, like the trial court, conclude that it is not necessary to address that issue in this appeal. Accordingly, we affirm.
Affirmed.

Although the city had initially determined that it owed some overtime to its firefighters, by the time of trial, it had taken the position that, properly construed, ORS 652.060 and ORS 652.070 did not entitle its firefighters to any unpaid overtime.

BOLI does not contend that it was entitled to a declaration regarding the proper means of calculating overtime even if the city did not owe any of its firefighters unpaid overtime. See Chernaik v. Brown , 295 Or. App. 584, 600, 436 P.3d 26 (2019) (declining to address the plaintiffs' requests for certain declarations, because the trial court's other conclusions had resolved the controversy between the parties); cf. ORS 28.060 ("The court may refuse to render or enter a declaratory judgment where such judgment, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding.").

ORS 652.060 provides:
"(1)(a) No person employed on a full-time basis as a firefighter by any regularly organized fire department maintained by any incorporated city, municipality or fire district and that employs not more than three persons on a full-time basis as firefighters shall be required to be on regular duty with such fire department more than 72 hours a week. However, any affected incorporated city, municipality or fire district shall be deemed to have complied with this paragraph and ORS 652.070 if the hours of regular duty required of firefighters employed by it average not more than 72 hours a week over each quarter of the fiscal year of the employing city, municipality or fire district.
"(b) No person employed on a full-time basis as a firefighter by any regularly organized fire department maintained by any incorporated city, municipality or fire district and that employs four or more persons on a full-time basis as firefighters shall be required to be on regular duty with such fire department more than 56 hours a week. However, any affected incorporated city, municipality or fire district shall be deemed to have complied with this paragraph and ORS 652.070 if the hours of regular duty required of firefighters employed by it average not more than 56 hours a week over each quarter of the fiscal year of the employing city, municipality or fire district.
"(2) In the event this section shortens the working hours of firefighters employed by any such city, municipality or fire district, the total wages of such firefighters shall not for that reason be reduced."

ORS 652.070 provides:
"(1) Every affected incorporated city, municipality and fire district shall put into effect and maintain a schedule of working hours required of regularly employed firefighters which shall not be in excess of the average hours established by ORS 652.060, and which shall provide for at least 48 consecutive hours off-duty time in each seven-day period. Any affected incorporated city, municipality or fire district failing so to do shall pay to every regularly employed firefighter as additional pay for every hour of regular duty required of and performed by the firefighter over and above the average hours established by ORS 652.060 a sum equivalent to one and one-half times the regular hourly rate of pay at the time of such default. However, in the case of replacement for any authorized leave, vacation or temporary vacancy, regularly employed firefighters in a department employing four or more persons on a full-time basis as firefighters may elect to work in excess of 56 hours a week at not less than their regular hourly rate of pay.
"(2) Nothing in subsection (1) of this section requires payment of one and one-half times the hourly rate of pay to a volunteer firefighter for hours of duty performed in excess of the average hours established by ORS 652.060."

ORS 652.080 provides that, "[i]n computing the average or total number of hours a week for the purposes of ORS 652.060 and 652.070, authorized vacation or sick leave time shall be considered as time on regular duty."

To illustrate the distinction, consider a fire department that employs exactly four firefighters. In a single quarter, the department requires three of those firefighters to work an average of 55 hours per week and requires the fourth firefighter to work an average of 57 hours per week. Thus, the four firefighters are required to work an average of 55.5 hours a week per firefighter. Under the city's interpretation, the fourth firefighter does not receive overtime, because the employer has required its "firefighters" to work, on average, less than 56 hours per week. Under BOLI's interpretation, the fourth firefighter does receive overtime, because the employer has required one of its "firefighters" to work, on average, more than 56 hours per week.

More specifically, because the trial court concluded that no firefighter was entitled to additional overtime pay, the court did not reach the parties' dispute over the interpretation of the requirement in ORS 652.070(1) that firefighters receive overtime pay for hours of work "over and above the average hours established by ORS 652.060."

As further discussed below, the city contends that ORS 174.127(1) and the cases applying it provide little guidance here, where the legislature has chosen to use both the singular and plural forms of the word "firefighter."

For example, although he opposed reducing the workweek for larger departments from 72 hours to 56 hours, the Mayor of Tillamook explained that, under the existing 72-hour limit, that city's "firemen work[ed] three 24-hour shifts and [had] four 24-hour shifts off each week." Minutes, House Committee on Local Government, SB 383, Apr. 23, 1969 (prepared statement of Howard Edwards, Tillamook City Mayor).

See, e.g. , Frequently Asked Questions , City of Portland Fire and Rescue, https://www.portlandoregon.gov/fire/article/378460 (accessed May 14, 2019) (explaining that Portland firefighters work a 24/48 schedule); Memorandum of Understanding Between Bend Firefighters Association, IAFF 0939 and City of Bend , http://www.bendoregon.gov/home/showdocument?id=144 (accessed May 14, 2019) (adopting a three-shift 48/96 schedule, in which the "regular work schedule for all shift employees is a 56-hour workweek based upon a 6-day work cycle").

Until 1969, the 72-hour maximum workweek applied to all fire departments regardless of size. See ORS 652.060(1) (1967), amended by Or. Laws 1969, ch. 581, § 1.

A 1940 report by the United States Bureau of Labor Statistics discusses the variations on two- and three-platoon systems in place throughout the country. See generally United States Department of Labor, Bureau of Labor Statistics, Bulletin #684, Salaries and Hours of Labor in Municipal Fire Departments (1940), available at https://books.google.com/books?id=e1bYfBiW3qwC&pg=RA4-PP1 (accessed May 14, 2019). For example, the report explains that, in some two-platoon systems, "the firemen are given additional time off duty which is not compensated for by a like period on duty," resulting in "average hours on duty per week [of] less than 84, usually 72." Id. Volume VIII, Mountain Division Cities , at 10. That volume also notes that "[a]lmost every fire department operates wholly under either one of the three platoon systems (single-platoon, 2-platoon, or 3-platoon system)." Id. at 11.

For example, firefighters working a three-crew, 24/48 schedule would average 56 hours every week of the quarter. ((2*24) + (2*24) + (3*24)) / 3 = 56. Necessarily, then, those same firefighters will also collectively average 56 hours per week over the quarter.

We acknowledge BOLI's theoretical concern that, if we accept the city's interpretation of the safe harbor provision, the city could avoid paying any firefighter overtime even if it required some firefighters to work as much as 72 hours a week, so long as it allowed enough other firefighters to work no more than 48 hours a week to maintain a 56-hour average. However, we observe, without expressing an opinion as to their application here, that the parties and amici all acknowledge that the city and other fire departments also are subject to collective bargaining agreements and federal hour and wage laws, which may well address those concerns. For present purposes, we simply reiterate that the legislature appears to have sought to accommodate existing practices, which do not appear to have raised the sorts of concerns that BOLI identifies.